Hillsborough
No. 89-102

THE STATE OF NEW HAMPSHIRE

v.

WILLIAM BERTRAND

March 8, 1991

*John P. Arnold,* attorney general (*Tina Schneider,* assistant attorney general, on the brief and orally), for the State.

*W. Kirk Abbott, Jr.,* assistant appellate defender, of Concord, by brief and orally, for the defendant.

THAYER, J. In this prosecution for receiving stolen property, the defendant brings an interlocutory appeal from a declaration of mistrial by the Superior Court (*Groff,* J.) and the court's denial of the defendant's subsequent motion to dismiss a criminal prosecution against him on the ground of double jeopardy. Two questions of law are presented for our consideration:

A. whether manifest necessity required the granting of the mistrial; and

B. whether the court erred in denying the defendant's motion to dismiss on the ground of double jeopardy.

For the reasons set forth below, we hold that the requisite manifest necessity was not present in this case and that double jeopardy bars further prosecution of this defendant on the original indictments.

On September 9, 1986, relying on information supplied by William Sylvester, an acquaintance of the defendant, the Nashua police seized various pieces of construction equipment at 930 West Hollis Street ("930 W. Hollis") in Nashua, including three air compressors, a backhoe, an earthmover, an arc welder, a bulldozer, and some automobile parts. They subsequently charged the defendant under RSA 637:7 with having received as stolen property two of the air compressors, the backhoe, the earthmover, and the automobile parts.

Prior to the defendant's November 1988 trial on these charges, the superior court granted his motion *in limine* and ordered the suppression of evidence concerning four items seized by the police but not included in the defendant's indictment: the bulldozer, one of the three air compressors, the arc welder, and an additional backhoe. The court also granted the defendant's pretrial motion to sequester witnesses. During the course of the trial, the State violated the *in limine* order, was accused of witness tampering in violation of the sequestration order, and failed to disclose exculpatory evidence.

The last of these errors occurred at the end of the day on November 2, 1988, the first day of the three-day trial, when Russell Perkins, the owner of 930 W. Hollis and one of the State's principal witnesses, informed counsel for the State that he knew of two men named "Bill Bertrand," one of whom was the defendant but both of whom were allegedly involved in the case. Perkins apparently had never before expressed to either the State or the defense his belief in the existence of two Bill Bertrands, but the State failed to disclose this information to the defense.

The first of several violations of the suppression order took place on the morning of the second day of trial, when a witness testifying on direct examination for the State mentioned having seen at least one of the suppressed items at 930 W. Hollis. Defense counsel objected, and, following an off-the-record bench conference, the court instructed the jury to disregard this testimony.

The second suppression order violation occurred later that morning, when a Nashua police officer testified that he had seen an "arc welder" during his search of 930 W. Hollis. Defense counsel once again objected and, at the ensuing bench conference, insisted that "the only remedy" was a motion to dismiss. The court denied this motion and asked defense counsel to choose between a second curative instruction or silence on the part of the court, telling the defendant that he could choose the latter if he felt that a second instruction would make matters worse for himself. Defense counsel replied that

"a motion to strike is not sufficient in this case. I am going to leave it at that." Counsel for the State then interjected that the police officer's testimony had not been prejudicial to the defendant because there was no suggestion by the State that the arc welder had been stolen. The court sustained the defendant's objection, but, in accord with the State's reasoning, denied his motion to dismiss and once again instructed the jury to disregard the testimony at issue. During this bench conference, the court also admonished the State to refrain from introducing any further evidence concerning the suppressed items.

A third suppression order violation followed immediately after the second curative instruction, when the same police officer testified that he had seen three air compressors at 930 W. Hollis. The defendant objected on the ground that only two air compressors had been included in the defendant's indictments, the third having been suppressed by the court's order on the motion *in limine*. At the subsequent chambers conference, defense counsel argued that, as the jury had previously heard testimony regarding the two air compressors included in the indictments, a further curative instruction would serve only to unfairly prejudice the defendant's case by arousing the jurors' suspicions either that he had received stolen property for which he had not been charged or that he was attempting to hide something from them. Defense counsel concluded that, therefore, a "motion to dismiss would be an appropriate remedy." The State, however, continued to insist that the third suppression order violation had not prejudiced the defendant. The State reasoned that the mere reference to an irrelevant object did not suggest that the defendant stole the object and that, because the State had not brought an indictment, it actually suggested the opposite. The court then noted that if it were to end the trial on the basis of the defendant's objection, a mistrial rather than a dismissal would be the appropriate remedy and asked defense counsel whether he had intended to move for a mistrial as part of his motion to dismiss. Defense counsel did not directly answer the court's query, replying only that "the [cumulative] effect of [the wrongly introduced testimony] has made it unlikely that there will be a fair determination by the jury." The court then ruled that as no prosecutorial misconduct necessitating dismissal had occurred, and as the defendant had not been prejudiced to an extent warranting a mistrial declaration, the trial would resume. The court once again warned counsel for the State not to violate the suppression order.

That same morning, the State called one of its principal witnesses, William Sylvester, in an attempt to link the allegedly stolen items to the defendant. Sylvester testified that he was a friend of the defendant and that he believed certain construction equipment at 930 W. Hollis belonged to the defendant. Some question apparently existed, however, as to Sylvester's credibility, owing to his own admissions at trial that he had previously been convicted for theft and for selling drugs, that he had "memory problems," and that he had lied on past occasions. There is some indication in the record, in fact, that Sylvester's lack of credibility amused the jurors to a point where they had to suppress laughter.

Apparently during the court's afternoon recess, following Sylvester's testimony, defense counsel inadvertently learned for the first time of the information Russell Perkins had provided the State the day before. Defense counsel became aware of this information after one of the State's witnesses, Police Lieutenant James D. Brackett, was overheard in the courthouse yelling at Perkins that he would be in "big trouble" if he testified to the existence of two Bill Bertrands. The court subsequently conducted a *voir dire* of Perkins in chambers, during which Perkins confirmed the threat by Lt. Brackett but also assured the court that he would nonetheless testify to the truth at trial.

Following the *voir dire*, Perkins testified in open court on direct examination that none of the construction equipment at issue belonged to him, that he had known the defendant for several years, and that he had rented storage space at 930 W. Hollis to several people, including the defendant. He further testified that the defendant had not rented this space on his own but had done so in conjunction with another individual, also named Bill Bertrand, and that it had been the latter Bertrand who had actually paid Perkins to rent the space. On cross-examination, Perkins testified that, prior to taking the stand, he had been threatened by Lt. Brackett not to testify to the existence of two Bill Bertrands and that he had turned over to the police a business card that the second Bill Bertrand had given him. The State, however, did not produce this card at trial and later told the court that the investigating police officers were unaware of its existence.

Also during the course of Perkins' testimony, two more violations of the court's suppression order apparently occurred. On direct examination by the State, Perkins said that there had been a "bulldozer," one of the suppressed items, on his property. Defense counsel

discussed the matter with the court in an off-the-record bench conference, but the court took no action at that time in response to this discussion. (The court later ruled that the testimony probably had not been prejudicial to the defense and that a curative instruction was unnecessary as it would do more harm than good to its case.) On cross-examination, Perkins again mentioned the bulldozer, but defense counsel did not object to the admission of this testimony.

At a chambers conference following Perkins' testimony, defense counsel claimed that the State's failure to disclose Perkins' statements constituted improper conduct necessitating dismissal of the charges. In particular, defense counsel pointed out that because he became aware of these statements only after Sylvester had testified, he had lost the opportunity to make use of them in cross-examining this principal State witness. The court then asked defense counsel, "[W]hat's your motion? Do you want the case dismissed?" Defense counsel replied, "Yes. I am not asking for a mistrial at this point. I am asking the case be dismissed." The court then took the matter under advisement.

On November 4, after the close of the State's case, the defendant moved to dismiss the charges against him, alleging, *inter alia*, (1) that his State and federal constitutional rights had been violated because the State had withheld from him information of evidentiary value (Perkins' statements and the alleged business card); (2) that Lt. Brackett had threatened Perkins prior to his testifying; and (3) that the State had violated the court's suppression order on several occasions. Defense counsel asked the court to "look at the entire case and the accumulation of what the State [has] done," and to conclude that it amounted to "an attempt of the State to deny Mr. Bertrand a fair trial." Defense counsel insisted that, therefore, "a mistrial at this point is inappropriate," and requested instead that the court dismiss the charges against the defendant.

Counsel for the State responded to the charge of withholding Perkins' exculpatory statements by pointing out that Perkins had not made such statements to him prior to the start of trial, that Perkins had been suffering from infirmities at the time of trial, and that the State therefore had not believed him when he claimed that there were two Bill Bertrands. The State added that the defendant had not been prejudiced by any of the alleged violations because the jury had learned of all the information allegedly withheld by the State, and because the defendant could have recalled Sylvester if he had wished

to cross-examine him regarding these matters. Therefore, the State concluded, "[t]his is not a case warranting dismissal."

The court then heard arguments on a motion by the defense to dismiss for lack of sufficient evidence and granted the motion with respect to the charges involving the automobile parts and the backhoe. As for the three remaining charges, the trial judge ruled,

> "I at this time cannot dismiss [them], but I am going to grant a mistrial in this case . . . . because I have taken all of the things that have happened in this trial that I have never had happen in any other trial I have been involved in. I just basically feel that there is existence of circumstances [sic] which indicate that justice might not be done and the jury might grant a verdict in this case for the wrong reasons and . . . not on the basis of the admissible evidence."

In so ruling, the court took into account the suppression order violations it had recognized at trial, as well as the prosecution's failure to disclose evidence to the defense. The court added that it did not intend to "[rule] out the possibility of the ultimate dismissal of this case" and asked the defendant to file a written motion to dismiss based on the alleged prosecutorial misconduct. Defense counsel reiterated that his client "does not want a mistrial at this point. He doesn't want to have to go through an entire trial again." The court responded that "I am not sure what you are telling me" and asked defense counsel whether or not his client wanted to go ahead with the trial. Defense counsel again replied that "I just want to make it clear that our position is that the proper remedy is dismissal." The court ruled that "I am going to grant the mistrial [anyway]. . . ." Still unsatisfied with defense counsel's response, however, the court tried yet again to pin down his position, telling him to "[g]o on the record. You are asking for dismissal and not a mistrial?" Defense counsel responded that "the defense believes the proper remedy for the various acts of misconduct by the State in this case is dismissal and not mistrial." The court's final words on the matter were, "I will not dismiss at this time. I think a mistrial is an appropriate remedy that the Court has in this matter. Certainly it was *not* requested by the defense. . . ." (Emphasis added.)

On January 24, 1989, the court heard arguments on the defendant's motion to dismiss the three remaining charges, at which time defense counsel once again objected to the court's mistrial declaration, stating that "to have Mr. Bertrand subject to a second trial on these remaining three charges would violate his right against double

jeopardy." Defense counsel asserted that he had not requested a mistrial at trial but, rather, had "wanted to go ahead" in the hope that the jury "would have come back and rendered a not guilty verdict. . . ." In so arguing, defense counsel altered somewhat the position he had maintained at trial, in effect withdrawing his charge of prosecutorial misconduct and its accompanying element of prejudice, in favor of denying the prejudicial effect to him of the State's trial errors. Defense counsel now asserted that the manifest necessity required for a mistrial did not exist. The court denied his motion.

In its written order of February 1, the court stated that the State had violated its suppression order "on at least three occasions" at trial and that, "[o]n each occasion, the defense requested a mistrial." The court, however, characterized the defense's subsequent motions to end the trial proceedings as motions "to dismiss." The court also noted that the jury might have overheard Lt. Brackett yelling at Russell Perkins "[s]ince this 'altercation' took place in a room directly adjacent to the courtroom." Basing its ruling on the suppression order violations, the State's failure to disclose information of evidentiary value to the defense and, apparently, on allegations by the defense of witness tampering and of the State's failure to comply with certain evidentiary and discovery rules, the court concluded that:

> "there were serious questions as to the ability of the jury to return a fair verdict based on the admissible evidence, and that the defendant was inhibited in presenting his defense in the manner which may have been most effective. Under all the circumstances, the Court finds there is manifest necessity for a mistrial or the ends of public justice would otherwise be defeated."

On appeal from the February 1 order, the defendant claims that he did not consent to the court's mistrial declaration, that the manifest necessity required to overcome his lack of consent did not exist, and that, therefore, the court violated the defendant's right against double jeopardy, protected by the fifth amendment of the Federal Constitution, and part I, article 16 of the New Hampshire Constitution. Because the federal double jeopardy provision affords the defendant the relief he seeks, we opt to decide this case under the Federal Constitution. *Cf. State v. King*, 131 N.H. 173, 176, 551 A.2d 973, 975 (1988).

■■ As has been made plain in the past, it would be an abuse of discretion for a judge to discharge a jury in derogation of a criminal

defendant's claim of right to be free of further jeopardy without the "manifest necessity" for so doing or the assurance that the "ends of public justice would otherwise be defeated." *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580 (1824). A corollary to this proposition is that, in the absence of "prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." *United States v. Dinitz,* 424 U.S. 600, 607 (1976) (quoting *United States v. Jorn,* 400 U.S. 470, 485 (1971)) (footnote omitted). The defendant in this appeal does not claim that he requested a mistrial in response to "prosecutorial or judicial overreaching," but, rather, that the court declared the mistrial without his consent and abused its discretion in so doing. The State claims, to the contrary, that the defendant requested the mistrial, thus precluding his present claim of double jeopardy, and that, even if he did not consent to the mistrial declaration and thereby preserved his double jeopardy claim, the court exercised its sound discretion in finding that the requisite manifest necessity existed for such a declaration. We hold that the defendant did not consent to the mistrial, and that the court abused its discretion in declaring the mistrial.

The parties do not dispute that the defendant repeatedly asked the court during the course of his trial to dismiss the charges against him. The State contends, however, that these requests were equivalent to requests for a mistrial with prejudice, and that, when asked by the court whether or not he wanted to continue the trial before the present jury, the defendant never explicitly asked to be allowed to do so. The State argues, therefore, that the defendant's requests for a dismissal were tantamount, for double jeopardy purposes, to a request for a mistrial. We disagree.

Regardless of whether the defendant's repeated motions are characterized as having been requests for a mistrial with prejudice or for a dismissal, it is clear that he requested, and that the court ultimately understood his having requested, something qualitatively different from a mistrial declaration. When a defendant requests a dismissal, or a mistrial with prejudice, he desires a complete end to the proceedings against him, whether or not such a result is warranted. A simple mistrial request, however, contemplates the possibility of retrial. This distinction is crucial, for the policy underlying the mistrial consent rule is that

"[t]he defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions."

*United States v. Dinitz, supra* at 608. Where, however, as here, a criminal defendant clearly states when requesting a dismissal that he does not want a mistrial declaration, it cannot fairly be said that he has opted for a mistrial. The defendant here made it abundantly clear on several occasions that he did not desire a mistrial declaration, a fact that the court itself recognized at the end of the trial when it stated, "certainly [a mistrial] was not requested by the defense. . . ." The court's apparent understanding that the defendant did not request a mistrial is further evidence of his lack of consent. *See United States v. Grasso*, 552 F.2d 46, 50 (2d Cir. 1977), *vacated on other grounds*, 438 U.S. 901 (1978).

■ The State, however, argues that even if the defendant moved for a dismissal rather than a mistrial, he did not explicitly state that he in fact desired either a complete dismissal or, in the alternative, a resumption of the trial in front of the present judge and jury. The State would have us hold that the defendant thus effectively consented to a mistrial. Contrary to the implication of the State's argument, a defendant generally cannot consent to a mistrial by silence, *see id.* at 49–50, and we hold, therefore, that where a defendant moves for dismissal and makes it clear to the court that he is asking for a final determination of the charges before the court and not for a mistrial, he need not explicitly state that he would prefer to continue the trial rather than have it end in a mistrial declaration in order to preserve a future claim of double jeopardy. *See Adkins v. Bordenkircher*, 674 F.2d 279, 283 (4th Cir.), *cert. denied*, 459 U.S. 853, 459 U.S. 878 (1982).

■ The State also argues that, even if the defendant objected to the mistrial, his objection came too late because he had already consented to the mistrial declaration after the second suppression order violation. At that time, the court asked defense counsel whether or not he was moving for a mistrial, and he responded only that, "it [is] unlikely that there will be a fair determination by the jury." Assum-

ing, *arguendo* (and as the superior court apparently did in its written order), that this response amounted to such consent, defense counsel effectively withdrew that consent prior to the court's mistrial declaration. Because the court based the mistrial partly on errors that occurred subsequent to, and that thus could not have prompted, defense counsel's alleged consent, it cannot be said that the defendant consented to the court's ultimate mistrial declaration. *See Lovinger v. Circuit Court of the 19th Jud. Circuit*, 845 F.2d 739, 743–44 (7th Cir.), *cert. denied*, 448 U.S. 851 (1988). Thus, we conclude that the court declared the mistrial without the defendant's consent. We next consider whether or not the court abused its discretion in ruling that manifest necessity required it to do so.

■ ■ Under the double jeopardy clause of the United States Constitution, a defendant has a "valued right to have his trial completed by a particular tribunal." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). Such a right exists because

> "'the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'"

*Brady v. Samaha*, 667 F.2d 224, 228 (1st Cir. 1981) (quoting *Green v. United States*, 355 U.S. 184, 187–88 (1957)). In order to declare a mistrial over a defendant's objection, a trial judge must find that there is "manifest necessity for the act, or the ends of public justice would otherwise be defeated." *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824). There are degrees of necessity, and a "high degree" of necessity is required to justify a mistrial without the consent of the defendant. *Arizona v. Washington, supra* at 506. Before declaring a mistrial, a trial judge "should first consider and find wanting all feasible, less drastic alternatives," *State v. King*, 131 N.H. at 177, 551 A.2d at 976 (citing *United States v. Jorn*, 400 U.S. at 486–87), and, "upon rejecting such alternatives, provide reasons for, and afford counsel an opportunity to be heard on the proposed mistrial." *King supra* (citing *Washington, supra* at 515–16).

■ ■ In this case, at the conclusion of the State's evidence, the declaration of a mistrial was improper because there was no mani-

fest necessity requiring a mistrial. We also note in passing that an argument could be made that counsel did not have an opportunity to respond on the record to the judge's contemplated decision to declare a mistrial. The alternatives to a mistrial were not discussed. It seems that once the trial judge had determined to grant a mistrial, he was more concerned with the double jeopardy issue raised by the defendant's motion to dismiss than with the possibility of implementing less drastic alternatives to a mistrial. Yet, more consideration should be given to the alternatives to granting a mistrial than to the consequences of granting one. The accepted practice in the protection of constitutional rights in this area requires the trial court, prior to declaring a mistrial, to exhaust alternatives, including giving permission to recall witnesses and giving cautionary instructions. In addition, counsel should be afforded the opportunity to be heard on the mistrial issue. *See King supra.* The granting of a mistrial is an extraordinary judicial sanction, and mistrials should be granted sparingly and only after the parties have been given an opportunity to assess their respective positions and make informed judgments thereon. "[T]he power (to declare a mistrial) ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Perez supra.*

 The trial judge declared a mistrial based on the following circumstances: the State's violations of the court's suppression order; Lt. Brackett's threatening of one of the State's principal witnesses, Russell Perkins, in violation of the court's sequestration order; and the State's failure to turn over to the defense exculpatory evidence which it had discovered the preceding afternoon—namely, Perkins' statements that he had not rented the space at 930 W. Hollis to the defendant, but to a second individual with the same name as the defendant. Any prejudice that may have resulted from the State's first two violations of the suppression order was cured when the judge instructed the jury to ignore the inadmissible testimony. Curative instructions are presumed to be understood and followed by the jury. *State v. Lemire,* 130 N.H. 552, 555, 543 A.2d 425, 426–27 (1988). Although the court did not issue any further curative instructions in response to the State's subsequent violations, the inadmissible testimony that was introduced can hardly be said to have "manifestly necessitate[d] a mistrial to further the ends of public justice." *King, supra* at 178, 551 A.2d at 976. Nor did the State's violation of the sequestration order irremediably prejudice the outcome of the trial. Despite Lt. Brackett's threats, Perkins testified that there was a

second Bill Bertrand. He also testified that these threats did not cause him to change his testimony.

██ ██ The State's failure to disclose to the defense Perkins' exculpatory statements, on the other hand, might have adversely affected the defendant's ability to receive a fair trial. Nonetheless, any prejudice in this respect could presumably have been remedied by the simple expedient of permitting Sylvester to be recalled and further cross-examined, and it is unlikely that the cumulative prejudice resulting from the State's errors would have risen to the level of necessity required to justify a mistrial without the defendant's consent, had such remedial action been taken. According to the record, however, the alternative of recalling Sylvester was not considered. We therefore hold that, based on these facts, the trial court erred as a matter of law in finding that manifest necessity required a mistrial, and that it abused its discretion in declaring a mistrial and denying defendant's motion to dismiss. The double jeopardy prohibition bars the defendant's retrial.

*Reversed.*

HORTON, J., did not sit; the other concurred.