14

Hillsborough-southern judicial district
No. 2000-513

## THE STATE OF NEW HAMPSHIRE

v.

## DANIEL AYER, SR.

Argued: March 12, 2003
Opinion Issued: September 26, 2003

*Peter W. Heed,* attorney general (*Kelly A. Ayotte,* associate attorney general, on the brief, and *Simon R. Brown,* senior assistant attorney general, orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, by brief and orally, for the defendant.

*Daniel E. Ayer, Sr.,* by brief, *pro se.*

NADEAU, J. The defendant, Daniel Ayer, Sr., appeals his conviction for first-degree murder and its mandatory sentence of life in prison without parole, *see* RSA 630:1-a (1996), which were entered after a jury trial in the Superior Court (*Hampsey,* J.). We reverse and remand.

On August 20, 1999, the defendant shot Mark Rowland, a Nashua social worker, when he arrived at the defendant's home for a previously

scheduled appointment. Rowland died from the gunshot wound and the defendant was arrested for his murder.

After booking the defendant at the Nashua Police Department, two detectives took the defendant to an interrogation room for questioning. The detectives advised the defendant of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), and obtained his waiver. Then, after the detectives questioned him for an hour and fifteen minutes, the defendant inculpated himself. The detectives asked the defendant if he would recount their conversation on videotape, to record a statement with his confession. The defendant agreed and the detectives recorded a forty-five minute statement with his confession. Only ten minutes of the recorded statement was introduced at trial. Soon thereafter, the defendant was indicted for Mark Rowland's murder. The defendant pleaded "not guilty" and his case was docketed for a jury trial.

On July 18, 2001, after eight days of jury selection but before the jury was sworn, the defendant moved to be allowed to represent himself after the jury was empanelled. After conducting a colloquy to determine if the defendant's request was knowing, intelligent and voluntary, the trial court granted the defendant's motion. The following day upon reconsideration, however, the trial court reversed its ruling because of the defendant's intention to proceed with trial *pro se in absentia* to protest certain earlier rulings the trial court had made.

The trial court ruled that proceeding *pro se in absentia* would be incompatible with self-representation, finding that although "the defendant is a competent individual, and . . . he has been made aware of the dangers and disadvantages of self-representation[,] . . . he has chosen to disregard these consequences in an effort to denounce the judicial process." The trial court found that these *circumstances* "skewed [the defendant's] otherwise knowing and intelligent ability to waive his right to counsel and represent himself in his trial for first-degree murder." Consequently, the trial court denied the defendant's motion and ordered his two appointed public defenders to continue representing him through trial.

The defendant filed an interlocutory appeal of this ruling, which we accepted. The trial court, however, refused to stay the trial and swore in the jurors, allowing opening statements, a view and eight witnesses to be examined over two days of trial, before we ordered a stay of proceedings on July 20, 2001. The next day, we summarily reversed and remanded to the trial court based upon our holding in *State v. Davis*, 139 N.H. 185 (1994), which allows a defendant to proceed *pro se in absentia* after a jury

has been empanelled if he does so in a knowing, intelligent and voluntary manner.

On remand, the trial court held a hearing on the appropriate remedy for its denial of the defendant's right of self-representation at that stage of trial. The defendant argued that the only appropriate remedy was a complete dismissal of his case with prejudice for the trial court's violation of his constitutional rights. The State, however, requested an opportunity to brief and be heard on the legal issues raised by the defendant's request for a mistrial with prejudice. The defendant did not object, and the trial court gave each party the opportunity to brief their positions. After reviewing the legal briefs, the trial court denied the defendant's request for a mistrial with prejudice and granted the State's request for a further hearing on whether the trial court, *sua sponte*, should grant a mistrial without prejudice over the defendant's objection or whether it should continue the trial.

At the second hearing, the defendant again argued that the only appropriate remedy was a complete dismissal of the charges because, otherwise, he would be required to sacrifice his constitutional rights to proceed *pro se*, to be tried by an impartial jury, and to be protected from double jeopardy. The State represented that the decision was within the court's discretion, and the State would proceed either with the same jury panel if the trial continued or with a new jury panel at a new trial if a mistrial without prejudice were granted. The trial court ruled that, before ordering either remedy, it would individually *voir dire* each of the fifteen jurors to determine whether, in light of the defendant's newly *pro se in absentia* status, they had been tainted by the defendant's earlier representation by counsel, thereby preventing the defendant from receiving a fair trial. *Cf. State v. Gould*, 144 N.H. 415, 417-18 (1999) (recommending juror *voir dire* before declaring mistrial).

Before doing so, the trial court again asked the parties if they objected to a mistrial without prejudice. The defendant did, citing double jeopardy and his earlier request for a mistrial with prejudice, and reminded the court that he did not waive his double jeopardy protections or his rights to a fair trial under the State and Federal Constitutions. The trial court then asked if the defendant had any comments on the trial court's proposed *voir dire* of the jurors. The defendant answered: "I object . . . because I believe no instruction can cure the prejudice. However, I still object to the mistrial without prejudice." The trial court finally engaged the defendant in the following colloquy to clarify his legal position on each issue:

> THE COURT: . . . you're objecting to these proposed voir dire . . . because no voir dire would be, what, sufficient or adequate for

the purposes of addressing any prejudice with the jury? Is that what you're saying, sir?

MR. AYER: That's correct, your Honor.

THE COURT: All right. And do you object to my conducting a voir dire of the jury this afternoon?

MR. AYER: Yes, your Honor.

THE COURT: All right. Probably we'll do so anyhow, *but I do want you to be heard on that.* So you . . . would not want to suggest to the Court in view of your position apparently any curative instructions, any means that the Court might take in order to maintain this trial, and so that we might continue with this trial to a conclusion?

MR. AYER: No, your Honor.

THE COURT: Is it your view that in view of my error made at the commencement of the trial regarding your self-representation, that under no circumstances can you receive an impartial trial with the present jury panel?

MR. AYER: Yes, your Honor.

. . . .

[THE STATE]: Your Honor, the defendant appears to be saying that there are no reasonable alternatives here. That's how I take his statement.

THE COURT: So do I.

. . . .

THE COURT: Okay. All right. So just to review the situation. I've made my decision, and have denied a mistrial with prejudice. I do not intend to revisit that subject notwithstanding Mr. Ayer's insistence that that is the only course — and it's an understandable position, because it would resolve in a double-jeopardy attaching and there would be no trial with no opportunity . . . for a jury to reach a unanimous verdict as to guilt or innocence. In my view, the way to proceed is one of the two remaining alternatives, . . . only if manifest necessity, or to protect the ends of public justice, . . . will I declare a mistrial without prejudice, which would then require [me] to excuse this

panel and the matter would be rescheduled for trial. Otherwise, I still have — I am still hopeful that we will be able to continue with this trial, but a final decision [cannot] be made until each of the fifteen jurors have been voir dired.

(Emphasis added.) The trial court then questioned the fifteen jurors on the record and decided to continue trial with the jury already empanelled, finding that neither manifest necessity nor the ends of public justice required a mistrial.

After hearing two days of unchallenged testimony and argument presented by the State, the jury deliberated for five hours and returned a guilty verdict on the charge of first-degree murder. The trial court entered the mandatory sentence of life imprisonment without parole, and this appeal followed.

On appeal, the defendant argues that: (1) the trial court erred by not granting a mistrial without prejudice over his objection; (2) the trial court erred by not suppressing the incomplete recording of his statement at the Nashua Police Department; (3) the trial court denied his right to be tried by a jury of his peers because it improperly excluded all jurors with financial hardships; and (4) the trial court should have recused itself after he threatened to harm court personnel. The defendant, *pro se*, also argues that: (1) the trial court erred by denying his request for a mistrial with prejudice; (2) the juror compensation scheme is unconstitutional; and (3) he received ineffective assistance of counsel in this appeal because the appellate defender did not address his seventeen other issues preserved in his notice of appeal.

## I. Mistrial without Prejudice

The defendant argues that the trial court should have ordered, *sua sponte*, a mistrial without prejudice over his objection, because the denial of his right to represent himself was a structural error that prevented him from receiving a fair trial with the empanelled jury. The State contends that, because the defendant refused to consent to a mistrial without prejudice as alternative relief below, he is barred from now requesting that relief on appeal. The State urges us, therefore, to find that this issue is not preserved for our review because the defendant did not ask for a new trial as relief from the constitutional error at trial.

■ We begin our discussion by noting that the issue in this case is not, as the State believes, one of preservation. Rather, the issue is whether requiring the defendant to proceed represented by counsel for two days of trial, contrary to his specific request to represent himself, should afford

the defendant a new trial. Our preservation rule requires that issues be raised at the trial court to preserve them for appellate review. *State v. Fortier*, 146 N.H. 784, 788 (2001). This rule allows the trial court to consider errors as they occur and to remedy them as necessary. *Id.* When trial courts have an opportunity to rule on issues and to correct errors before they are presented to the appellate court, the preservation requirement is satisfied. *State v. Bain*, 145 N.H. 367, 370 (2000).

In this case, at a hearing held at the State's request, the trial court clearly addressed its error in denying the defendant his right to represent himself, and it expressly considered whether a mistrial without prejudice should be granted over the defendant's objection as the appropriate remedy for that error. Indeed, the trial court held two hearings to address the appropriate remedy for its error. At each hearing the defendant, the State and the trial court addressed the two alternatives to granting a mistrial with prejudice on the record. The defendant objected to each alternative, while the State objected to neither. The trial court preserved each party's express position on each available remedy and carefully preserved a comprehensive record for our review.

■ ■ To adopt the State's strict construction of our preservation rule would run contrary to our preservation jurisprudence. In the past, we have found that when an issue is directly raised by the trial court and subsequently addressed by both parties and the court, it is adequately preserved for appellate review. *See State v. Tucker*, 145 N.H. 723, 726 (2001); *see also State v. Dowdle*, 148 N.H. 345, 347-48 (2002); *State v. Bruce*, 147 N.H. 37, 40 (2001); *State v. Duhamel*, 128 N.H. 199, 202 (1986); *State v. Goding*, 128 N.H. 267, 270 (1986). Perhaps more importantly, however, we have always found that when a trial court holds a separate hearing on a single issue, a defendant need neither object nor except to adverse dispositive rulings on that legal issue. *See State v. Penn*, 127 N.H. 351, 351 (1985); *Rodrigue v. LaFlamme*, 122 N.H. 966, 969 (1982).

After denying the defendant's motion for a mistrial with prejudice, the trial court held a separate hearing on the issue of the appropriate remedy for its violation of the defendant's right to self-representation. Again, we emphasize that the trial court did so at the State's request. At that hearing, the trial court informed the defendant of his two remaining available remedies and asked the parties for their legal positions on each available remedy, making a thorough record of the *defendant's contemporaneous objection* to each remedy, as well as the State's position and the trial court's ruling on each remedy.

■ The trial court knew that its order to continue trial was contrary to the defendant's wishes in this case, but it addressed whether it should order a mistrial without prejudice or have the trial continue "notwithstanding [the defendant's] insistence that [a complete dismissal] is the only course." Ultimately, the trial court ordered that the trial continue despite the defendant's position that "under no circumstances can [he] receive an impartial trial with the present jury panel." Therefore, the issue whether the trial court should have granted a mistrial without prejudice over the defendant's objection is preserved under even our more stringent contemporaneous objection rule. *See State v. McMinn*, 141 N.H. 636, 642 (1997); *State v. McAdams*, 134 N.H. 445, 449 (1991).

The State's position in this appeal would require criminal defendants to affirmatively waive their double jeopardy protections under the State and Federal Constitutions and request a mistrial without prejudice, to preserve any other constitutional issue for our discretionary appellate review. It would also effectively overrule our jurisprudence on the issue of granting a mistrial *without prejudice over a defendant's objection,* because a defendant could no longer object to such relief or ever request only a mistrial with prejudice and later receive any meaningful appellate review. *Cf. State v. Bertrand*, 133 N.H. 843, 852 (1991).

In *Bertrand*, the defendant requested a complete dismissal of his case and refused to acknowledge any other alternative remedy. *Id.* at 849. As in this case, when the trial court asked if the defendant wanted to proceed with the trial, he made clear that his "position is that the proper remedy is dismissal." *Id.* The trial court then, as here, confirmed that the defendant was requesting only complete dismissal and not a mistrial, ultimately ruling, "I will not dismiss at this time. I think a mistrial is an appropriate remedy that the Court has in this matter. Certainly it was not requested by the defense." *Id.* Prior to his second trial, the defendant moved to dismiss the charges because there was no manifest necessity requiring the mistrial, claiming a second trial violated his right against double jeopardy. *Id.* at 850. The trial court denied the defendant's motion and we reversed. *Id.* at 844.

■ In reversing, we clarified the distinction between a request for a mistrial with prejudice and a request for a mistrial. *Id.* at 852. In doing so, we held:

> [W]here a defendant moves for dismissal and makes it clear to the court that he is asking for a final determination of the charges before the court and not for a mistrial, *he need not explicitly state that he would prefer to continue the trial rather than have it end*

*in a mistrial declaration in order to preserve a future claim of double jeopardy.*

*Id.* (emphasis added). From this, it only follows that a defendant need not explicitly state that he would prefer a mistrial without prejudice than to continue trial with a jury prejudiced by the trial court's earlier error in order to preserve a future claim for a constitutional violation of his right to self-representation.

This defendant, like *Bertrand,* objected both to continuing trial and having the trial result in a mistrial. *Id.* He too requested only a complete dismissal as relief. *Id.* at 850. When confronted with the decision whether to continue trial, the defendant again asserted that dismissal was the only appropriate remedy and told the court that he could not get a fair determination from the empanelled jury. *Id.* Under the State's reasoning, we must find that this defendant consented implicitly to continuing trial with a prejudiced jury because he did not request explicitly a mistrial and waive his double jeopardy rights. This is directly contrary to our holding in *Bertrand,* which extended to its logical conclusion implicitly states that a defendant need not request a mistrial without prejudice in order to preserve a constitutional claim.

Additionally, the State's position would eliminate the need for a trial court to ever inquire into juror prejudice, manifest necessity or the ends of public justice before declaring a mistrial without prejudice, since criminal defendants would be required to waive their constitutional protection from double jeopardy in order to preserve any constitutional challenge other than double jeopardy. *But cf. Bertrand,* 133 N.H. at 853-54.

Consequently, we are faced squarely with the substantive question of whether the trial court, *sua sponte,* should have ordered a mistrial without prejudice over the defendant's objection because the defendant was denied his right of self-representation for the first two days of his trial. "A mistrial is appropriate when the circumstances indicate that justice may not be done if the trial continues to a verdict." *State v. Kerwin,* 144 N.H. 357, 358-59 (1999) (quotation omitted). To justify a mistrial, the conduct complained of must "constitute an irreparable injustice that cannot be cured by jury instructions." *Id.* (quotation omitted). Because the trial court is in the best position to gauge whether the circumstances at trial make a mistrial appropriate, *see id.* at 359, we will not overturn its decision denying a mistrial absent an unsustainable exercise of discretion, *see State v. Hall,* 148 N.H. 671, 674 (2002).

The defendant argues that, in this case, the trial court was required to order a mistrial whether or not the defendant requested that relief, because the denial of his right to self-representation was a structural

defect, which irreparably tainted the proceedings. The defendant's argument is based upon both the Federal and State Constitutions. Thus, we look first to the protections afforded by the New Hampshire Constitution, using federal cases only to aid our analysis. *See State v. Panzera*, 139 N.H. 235, 237 (1994).

Although we have never expressly adopted the federal distinction between a "structural defect" and a "trial error," we have recognized that certain constitutional errors necessarily render a trial fundamentally unfair and require reversal without regard to the evidence in the particular case. *See State v. Williams*, 133 N.H. 631, 634 (1990). Such fundamental errors are not subject to a harmless error analysis. *See id.* Under federal case law, "structural defects" are distinguished from "trial errors" for the same reason. *See Arizona v. Fulminante*, 499 U.S. 279, 308-12 (1991) (explaining distinction).

A structural defect affects the very framework in which a trial proceeds. *See id.* at 310. Such defects arise from errors that deprive a criminal defendant of the constitutional safeguards providing a fair trial; therefore, if the trial proceeds after such an error occurs, "justice will not still be done." *Johnson v. Zerbst*, 304 U.S. 458, 462 (1938) (quotation omitted). When a structural defect exists, "a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Fulminante*, 499 U.S. at 310. In contrast, a "trial error" occurs during the presentation of a case to a jury and can be "quantitatively assessed in the context of other evidence in order to determine whether [the error] was harmless beyond a reasonable doubt." *Id.* at 307-08. A structural defect, however, infects "[t]he entire conduct of the trial from beginning to end[,]" *id.* at 309, and therefore "constitute[s] an irreparable injustice that cannot be cured by jury instructions[,]" *Kerwin*, 144 N.H. at 359 (quotation omitted).

■ ■ When a structural defect occurs, a trial judge should order a mistrial without prejudice because the defect "would make reversal on appeal a certainty, [and] it would not serve 'the ends of public justice' to require that the Government proceed with its proof when, if it succeeded before the jury, it would automatically be stripped of that success by an appellate court." *Illinois v. Somerville*, 410 U.S. 458, 464 (1973). Although, as in this case, jeopardy may have attached when the jury was sworn, a retrial would not be barred because a structural defect is one of the circumstances where "the purpose of law to protect society from those guilty of crimes . . . would be frustrated by denying [a court] power to put the defendant to trial again." *Id.* at 470 (quotation omitted). "[T]he duty of

the judge in this event is to discharge the jury and direct a retrial." *Id.* (quotation omitted). "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Id.* (quotation and emphasis omitted). The purpose of double jeopardy protection is to prevent the State from oppressively prosecuting a criminal defendant multiple times for the same offense. *See id.* When there is no oppressive conduct at issue and there is a structural defect irreparably tainting the fairness of a criminal prosecution, retrial is not prohibited because "the defendant's interest in proceeding to verdict is outweighed by the . . . legitimate demand for public justice." *Id.* at 471.

In declining to order a mistrial without prejudice, the trial court found that its denial of the defendant's right of self-representation for the first two days of trial was not a structural defect because the error was "remedied by the Supreme Court's intervening order during the early stages of this trial, by conducting individual *voir dire* and by providing each juror with curative instructions." Relying upon *McKaskle v. Wiggins*, 465 U.S. 168, 184 (1984), the trial court found that, in light of its remedial actions in the early stages of trial, its error constituted only "a slight erosion" of the defendant's right of self-representation, which is "tolerable" because the defendant had "a fair opportunity to personally defend himself for the balance of the trial."

While we commend the trial court for its attempts to remedy its error and for exploring all available alternatives to a mistrial, we find that it erroneously interpreted the holding of *McKaskle* when it ordered trial to continue in this case. The denial of the defendant's right of self-representation was a structural defect in the proceedings below, *see McKaskle*, 465 U.S. at 177 n.8, which made the "public's interest in fair trials designed to end in just judgments" outweigh the defendant's interest in having his trial completed by a particular tribunal or in avoiding retrial, *Somerville*, 410 U.S. at 470 (quotation and emphasis omitted). Therefore, we must reverse the defendant's conviction and order a new trial. *See id.*; *see also Sherwood v. State*, 717 N.E.2d 131, 137 (Ind. 1999).

▆▆ Under Part I, Article 15 of the New Hampshire Constitution and the Sixth Amendment to the United States Constitution, a criminal defendant is guaranteed the right of self-representation as well as the right to counsel. *See Panzera*, 139 N.H. at 237-38. Because these fundamental rights are antithetical though, the exercise of one right nullifies the other. *Id.* at 238. Neither constitution provides a right to hybrid representation, where a defendant acts either as co-counsel, *see State v. Barham*, 126 N.H. 631, 638 (1985), or "choreograph[s] special

appearances by counsel." *McKaskle*, 465 U.S. at 183. Thus, when a defendant "clearly and unequivocally" waives his right to counsel by exercising his right to represent himself in a timely manner, *see Sherwood*, 717 N.E.2d at 135, and his waiver is "knowingly and intelligently made," *Barham*, 126 N.H. at 639, the exercise of the right of self-representation must be scrupulously respected through all critical stages of his criminal prosecution and cannot be revoked without affirmative action by the defendant to rescind his waiver and reinstate his right to counsel, *see State v. Enright*, 108 N.H. 227, 232 (1967).

No one disputes that the defendant knowingly, intelligently and voluntarily waived his right to counsel in this case when he exercised his right to represent himself. *Cf. Panzera*, 139 N.H. at 237. Nor does anyone dispute that the defendant's request was made in a timely manner. *Cf. Sherwood*, 717 N.E.2d at 135. Indeed, when the trial court denied the defendant's motion for self-representation, it stated: "There is no doubt that the defendant is a competent individual, and that he has been made aware of the dangers and disadvantages of self-representation."

The problem in this case is that the defendant was subjected to a form of unwanted hybrid representation because he was erroneously represented by counsel for the first two days of trial and represented by no one for the remainder of trial. *Cf. Sherwood*, 717 N.E.2d at 133. This unwanted representation for the first two days of trial defeated the defendant's right of self-representation because it deprived him of control over the case he presented to the jury and it undermined his appearance of autonomy in the jury's perception. *See McKaskle*, 465 U.S. at 185.

In *Faretta v. California*, 422 U.S. 806, 832-36 (1975), the Supreme Court first affirmatively held that at a criminal trial a State cannot constitutionally force a lawyer upon a criminal defendant who knowingly, intelligently and voluntarily desires to represent himself. The Court found that "forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Id.* at 817. This is because the constitutional guarantee of the assistance of counsel contemplates that counsel will be an assistant to aid a defendant in presenting his personal defense to a jury, not a master who dictates the defense a defendant must present. *Id.* at 820.

> An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense.

*Id.* at 821.

The *Faretta* Court recognized that, while "in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts[,] . . . it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense." *Id.* at 834. Because the "right to defend is personal" and "[p]ersonal liberties are not rooted in the law of averages," a defendant's "choice must be honored out of that respect for the individual which is the lifeblood of the law." *Id.* (quotation omitted). The Court did note that a State may constitutionally appoint standby counsel to aid an accused and to be available if the trial court needs to terminate the right of self-representation. *Id.* at 834 n.46.

In *McKaskle*, 465 U.S. at 177-79, the Supreme Court defined the limits of representation by any standby counsel appointed to protect a defendant's *Faretta* rights from being eroded by unwanted participation by counsel. The *McKaskle* Court ruled that the focus for deciding if a defendant's *Faretta* rights have been violated by unwanted participation by counsel is "whether the defendant had a fair chance to present his case in his own way." *Id.* at 177. This is because "[t]he right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *Id.* at 176-77. The Court observed that limits must be placed on any standby counsel's participation at trial because if a defendant's right of self representation is violated, it is not amenable to a harmless error analysis. *Id.* at 177 n.8. The right of self-representation "is either respected or denied; its deprivation cannot be harmless." *Id.*

■ The core of the *Faretta* right is the defendant's entitlement to control all aspects of the case he presents to the jury. *See id.* This right can be violated by unwanted participation by counsel in two ways. *See id.* at 178. First, a violation occurs if counsel, over the defendant's objection, interferes with any significant tactical decision of the defense, including the control over the questioning of witnesses, or if counsel speaks "*instead* of the defendant on any matter of importance." *Id.* Second, a violation occurs if counsel participates at trial, without the defendant's consent, so that the jury loses the perception that the defendant is representing himself. *Id.* This is because, from both the defendant's and the jury's perspectives, "the message conveyed by the defense may depend as much on the messenger as on the message itself." *Id.* at 179. Just as we do not allow a defendant to be co-counsel, *Faretta* does not allow hybrid representation, because a defendant cannot be allowed to "choreograph special appearances by counsel." *Id.* at 183. It only follows that a judge is

prohibited from choreographing a similar form of hybrid representation. *See id.*

■ By continuing trial after erroneously denying the defendant's right of self-representation, the trial court violated each of the principles laid out in *McKaskle*. First, it allowed the defendant's appointed counsel to present a defense to the jury contrary to the defendant's express wishes. The defendant wanted nothing to be said on his behalf at trial. In direct violation of the defendant's wish, counsel presented an opening statement, a statement on the view, and questioned eight witnesses. This conduct undermined the defense that the defendant wanted to present to the jury. Second, by continuing trial after the jury had seen the defendant represented by two attorneys presenting a defense throughout jury selection, opening statements, a view and examination of eight witnesses, the trial court obfuscated any jury perception that the defendant was representing himself by not defending against the charges because the jury saw neither an attorney nor the defendant contest the State's prosecution for the remainder of trial. These errors are structural because they affected the framework in which this trial proceeded. Therefore, these errors could not be remedied by juror *voir dire* or curative instructions, regardless of how comprehensive such curative measures might be.

Indeed, we find it difficult to imagine any jury not being biased, confused or affected by these facts, and the record shows that at least a few jurors were affected by this change in status before it even occurred. During the trial court's individual *voir dire*, one juror asked if she should disregard the opening statements and first eight witnesses since the defendant had not been representing himself. Another juror specifically questioned the judge about the defendant's *in absentia* status stating, "How can he represent himself if he's not here?" After the trial judge gave an explanation, the same juror asked, "So if he is defending himself he'll be doing it through someone else?" A third juror responded, "I'm trying to figure in my head how he — it's kind of like — doesn't make sense if he is representing himself but not being here at the same time." Finally, a fourth juror did not grasp the role of standby counsel sitting in the gallery, when they had previously been at counsel table with the defendant. These are not the questions of an unaffected jury. Undoubtedly, the initial ruling requiring the defendant to be represented by counsel made this confusion worse.

Contrary to the trial court's order, these errors were not merely a "slight erosion" of the defendant's *Faretta* rights. Nor were they constitutionally "tolerable." *Cf. id.* at 183. While *McKaskle* does not place

"a categorical bar on participation by standby counsel in the presence of the jury," it finds participation by counsel constitutionally acceptable only if it is invited by the defendant or for the limited purpose of assisting the defendant with procedural or evidentiary obstacles at trial. *Id.* at 182-83. *McKaskle* found that these "slight erosions" of a defendant's right of self-representation would be "tolerable" because they occur only with the defendant's consent, or they do not affect a defendant's control over his defense and appearance in front of the jury. *Id.* at 183. These are not the types of "erosions" of the defendant's *Faretta* rights that occurred in this case.

In contrast to the "slight erosions" of the *Faretta* right explained above, a direct violation of the defendant's *Faretta* rights occurred by continuing trial in this case. The defendant could not control the defense presented to the jury for the first half of trial and he was subjected to a form of hybrid representation choreographed by the court because the jury thought he was both represented by counsel and defending the charges for the first half of trial, while the defendant wanted only to be tried *in absentia* without a defense. These are structural errors, which cannot be subject to a harmless error analysis and which "constitute an irreparable injustice that cannot be cured by jury instructions[,]" *Kerwin*, 144 N.H. at 358-59 (quotation omitted).

Under these circumstances, the only way trial should have continued is if the trial court had obtained an affirmative personal waiver from the defendant for the violation of his *Faretta* rights. *See State v. Hewitt*, 128 N.H. 557, 561 (1986) (stating same for violation of right to a twelve-member jury). The defendant's affirmative objection to a mistrial without prejudice — the remedy to which he was entitled and which the trial court was prepared to afford — may have been a waiver. We are foreclosed from considering the issue of waiver in this case, however, because the State conceded at oral argument that the defendant's objection should not be construed as a waiver. In the absence of a waiver, the appropriate remedy for this constitutional violation must place the defendant as close to the position he would have been in before his rights were violated, which, here, would be with a newly-empanelled jury, untainted by the violation. *See, e.g., United States v. Morrison*, 449 U.S. 361, 365 (1981) (stating same when defendant was represented by a conflicted counsel); *see also Mickens v. Taylor*, 535 U.S. 162, 194-95 (2002) (Souter, J., dissenting).

 Contrary to the defendant's position, a complete dismissal would be plainly inappropriate for a violation such as this. *See Morrison*, 449 U.S. at 366. Rather, a trial court must neutralize the taint of its earlier error by tailoring relief appropriate to the circumstances that balances a

defendant's constitutional rights with society's interest in achieving a fair trial. *See id.* at 365. In this case, the way to do so is to order a new trial where the defendant can proceed *pro se in absentia,* if he still wishes to do so, and where society receives a fair trial with a jury untainted by the prior proceedings. *See id.* Accordingly, we hold that by continuing trial after the defendant's *Faretta* rights were violated, the trial court unsustainably exercised its discretion.

 Finally, in addition to the underlying structural defect requiring a new trial, *see Somerville,* 410 U.S. at 471, because the defendant is successful in appealing his judgment of conviction on constitutional grounds, there can be no double jeopardy challenge at his new trial as a matter of law. *See State v. Beaupre,* 129 N.H. 486, 487 (1987). The Federal Constitution provides the defendant with no greater protection under these circumstances. *See Faretta,* 422 U.S. at 835-36 (ordering new trial as remedy for violation of right of self-representation); *United States v. Scott,* 437 U.S. 82, 91-94 (1978) (finding double jeopardy is not implicated when a new trial is required by defendant's successful appeal of conviction or when required by inadvertent judicial error).

Our decision on this issue, requiring a reversal of the defendant's conviction and a new trial, renders many of the defendant's remaining arguments moot or unripe for our review. We therefore address only those arguments that are likely to arise on the remand of this case.

## II. Motion to Suppress Recorded Statement

The defendant's second argument asserts that the trial court erred by not suppressing his recorded statement at the Nashua Police Department based upon our holding in *State v. Barnett,* 147 N.H. 334 (2001). In *Barnett* we held that:

> To avoid the inequity inherent in admitting into evidence the selective recording of a post-*Miranda* interrogation, we establish the following rule: In order to admit into evidence the taped recording of an interrogation, which occurs after *Miranda* rights are given, the recording must be complete. The police need not tape the administration of a defendant's *Miranda* rights or the defendant's subsequent waiver of those rights. However, immediately following the valid waiver of a defendant's *Miranda* rights, a tape recorded interrogation will not be admitted into evidence unless the statement is recorded in its entirety. Unlike *Stephan* and *Scales,* failure to record the complete interrogation will not result in the wholesale exclusion of the interrogation. *See*

*Stephan,* 711 P.2d at 1163; *see also Scales,* 518 N.W.2d at 592. Rather, where the incomplete recording of an interrogation results in the exclusion of the tape recording itself, evidence gathered during the interrogation may still be admitted in alternative forms, subject to the usual rules of evidence. In light of our ruling, admission of the incomplete recording of the defendant's interrogation is not permissible. Therefore, the defendant's convictions are reversed and the matter is remanded.

*Id.* at 337-38.

 The State acknowledges that our *Barnett* ruling is dispositive of this issue, but argues that the ruling should not be retroactively applied to this case because it would apply a new rule to a trial for conduct occurring before we issued our ruling in *Barnett.* As with the enactment of any new procedural statute or court rule, when a law affects only procedural or remedial rights it is deemed applicable to all cases not yet final, or not yet past the procedural stage to which the new rule applies, on the effective date of the new rule. *See State v. Hamel,* 138 N.H. 392, 394 (1994).

 Accordingly, because the defendant is entitled to a new trial, his case is not yet final and the trial court should apply the *Barnett* rule to the defendant's motion to suppress his partially recorded statement when the issue arises on remand. We will not, as the State suggests, decide whether the admission of the recorded statement in this case was harmless error because the trial court has not yet had the opportunity to address the tape's admission under the *Barnett* rule.

*III. Jury Selection*

The defendant argues that the trial court, in violation of the juror selection statute, unfairly and unconstitutionally denied his right to be tried by a fair cross-section of his peers when it dismissed thirty-two potential jurors who claimed undue economic hardship. As a preliminary matter, the State asserts that this issue was not properly preserved for our review because the defendant did not object to the juror dismissals until most of the thirty-two jurors had already been excluded. We will assume without deciding that the defendant's motion prior to the conclusion of jury selection asserting that the trial court had violated constitutional and statutory law by excluding jurors on the grounds of their economic status was sufficient to preserve his argument.

*A. Constitutional Violation*

The parties apply the same test for evaluating a constitutional challenge to juror selection under both the State and Federal Constitutions. *See Duren v. Missouri*, 439 U.S. 357, 364 (1979); *State v. Elbert*, 121 N.H. 43, 45 (1981). To establish a *prima facie* violation of the fair cross-section requirement, a defendant must demonstrate:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Elbert*, 121 N.H. at 45 (quotations omitted). The defendant argues that the group of jurors that was excused from jury service at his trial was a distinctive group in the community. We disagree.

 "A 'distinctive group' or 'cognizable class' is a commonly recognized group whose members hold some similar attitudes." *Id.* The defendant identifies the group excluded as "jurors who would suffer economic difficulty as a result of having to serve for multiple weeks at the statutory rate of compensation." According to the defendant, this group included people who are self-employed, work on commission, or have a relatively low income. The record reveals, however, that the only thing this group shares in common is that they all raised a concern regarding the economic impact to themselves or their families of serving on a jury for three weeks. No logical inference, however, may be drawn regarding each group member's economic status. For example, a person who is self-employed or works on a commission may earn a substantial income, the absence of which would impose a hardship upon that individual's ability to maintain his or her standard of living. Furthermore, as the State points out, the jurors who were excused were a diverse group, including single mothers, a physician, a consultant, a real estate agent, business owners, a truck driver, and salespersons. We are unable to conclude, based on the record provided, that the thirty-two excused jurors represented a distinctive group; nor is there any information regarding the economic status of the remaining jurors in the pool of over one hundred. Because the defendant has not demonstrated that the jurors excused by the trial court comprised a distinctive group, the defendant cannot establish a *prima facie* violation of the constitutional right to a fair cross-section of jurors.

Because the defendant does not argue that the State Constitution provides any greater protection than the Federal Constitution, we conclude that neither the defendant's State nor federal constitutional rights were violated. *See Duren,* 439 U.S. at 364; *Elbert,* 121 N.H. at 45.

*B. Statutory Violation*

In assessing alleged violations of the juror selection statute, we will first determine whether the actions complained of constituted violations of the statutory jury selection procedures, *see* RSA ch. 500-A, and then consider whether any "deviations from the statutory procedure, taken as a whole, resulted in substantial noncompliance with the statute." *State v. Martel,* 141 N.H. 599, 600-01 (1997).

> The legislative policy underlying the [jury selection] statute is that all persons selected for jury service should be selected at random from a fair cross section of the population of the area served by the court. To accomplish this purpose substantial compliance with the essential provisions of RSA chapter 500-A is required. The burden of making a *prima facie* case for substantial noncompliance is on the defendant. In most cases the defendant must show the irregularities constituted such material departures from the statutory provisions as to prejudice his rights.

*Id.* at 603 (quotations, citations and emphasis omitted).

RSA 500-A:4 prohibits exclusion from jury service "on account of race, color, religion, sex, national origin or economic status." RSA 500-A:4 (1997). A prospective juror "may be excused from jury service by the court only upon a showing of undue hardship, extreme inconvenience, public necessity or for any other cause that the court deems appropriate." RSA 500-A:11 (1997).

We begin by noting that potential jurors were not discriminated against or automatically excluded upon the basis of their economic class. The defendant raises concerns regarding potential jurors who were excluded only after they asserted that jury service would pose an undue hardship. We will first examine whether the dismissals amounted to substantial noncompliance with the statute.

"Statutory noncompliance generally rises to a substantial level and prejudice to the defendant occurs when the purposes of the statute — random selection of jurors from a fair cross section of the community — are contravened." *Martel,* 141 N.H. at 603. As the State points out, several of the thirty-two jurors were dismissed for reasons in addition to economic

hardship such as lack of child-care, health problems and conflict of interest. When the court ruled on the defendant's motion, there was no evidence regarding the economic status of the selected jurors. As the court stated:

> There may well be persons [remaining in the jury pool] who are either unemployed, or modestly employed, do not have income coming in during the three weeks of trial, or are self-employed that are without income but have the ability to survive economically, or just have not asked to be excused on that basis.

Hence the pool of potential jurors, even after some were dismissed, did not necessarily exclude jurors whose incomes were similar to the defendant's. On appeal, the defendant has failed to demonstrate that any possible irregularities constituted such a material departure from a random selection of jurors from a fair cross-section of the community as to prejudice his rights.

### C. Constitutionality of Juror Reimbursement Statute

The defendant argues that the juror compensation scheme, RSA 500-A:4, :11, violates numerous provisions of the State and Federal Constitutions. *See* U.S. CONST. amends. V, VI, XIV; N.H. CONST. pt. I, arts. 1, 2, 3, 10, 12, 14, 15, 16, 17, 21, 35. We begin by noting that although he cites Part I, Article 21 of the New Hampshire Constitution, the defendant does not argue that RSA 500-A:15 (1997), which sets juror compensation at $10.00 per half-day of service, violates the constitutional requirement that jurors be "fully compensated" for their time. N.H. CONST. pt. I, art. 21.

In the realm of appellate review, a mere laundry list of complaints, without developed legal argument, is insufficient to warrant judicial review. *See State v. Blackmer*, 149 N.H. 47, 49 (2003). The defendant's off-hand invocation of constitutional rights, supported by neither argument nor authority, warrants no extended consideration on appeal. *See id.* We conclude that the defendant has not demonstrated that the juror compensation scheme violates either State or federal constitutional guarantees. *See id.; State v. Chick*, 141 N.H. 503, 504 (1996).

### IV. Motion to Recuse

The defendant filed two motions to recuse all judges who hear cases in the Hillsborough County Superior Court-Southern Judicial District, based on his threat to harm superior court personnel. The court denied both motions, finding in response to the first that the defendant had "not

demonstrated bias, likelihood of bias or appearance of bias such that the judges who typically preside in Hillsborough County Superior Court, Southern [Judicial] District, would be unable to impartially preside over this case." Furthermore, the court did not find the threats to be "the type of serious, genuine threats which justify a finding that the impartiality of these judges may reasonably be questioned." Ruling on the defendant's second motion to recuse, the court concluded that the new motion did not warrant orders inconsistent with its prior findings and rulings. The defendant argues that the court violated his State and federal constitutional rights to due process and a fair trial before an impartial judge when it denied his second motion to recuse.

██ ██ The New Hampshire Constitution guarantees the "right of every citizen to be tried by judges as impartial as the lot of humanity will admit." N.H. CONST. pt. I, art. 35. The Code of Judicial Conduct reflects this guarantee. See SUP. CT. R. 38, Canon 3E(1) (formerly Canon 3C(1)). "The Code of Judicial Conduct requires disqualification of a judge in a proceeding in which the judge's impartiality might reasonably be questioned and to avoid even the appearance of impropriety." *State v. Whittey*, 149 N.H. 463, 465 (2003) (quotation omitted). The test for evaluating whether a court erred in refusing to disqualify itself based on its alleged partiality is the same under the New Hampshire Constitution, the Code of Judicial Conduct and general principles of federal due process. *State v. Linsky*, 117 N.H. 866, 882 (1977). We will first address the claim under the New Hampshire Constitution and the Code of Judicial Conduct, citing federal law only as an aid to our analysis. *Ball*, 124 N.H. at 231-33.

> Whether an appearance of impropriety exists is determined under an objective standard, *i.e.*, would a reasonable person, not the judge [him or] herself, question the impartiality of the court. The test for the appearance of partiality is an objective one, that is, whether an objective, disinterested observer, fully informed of the facts, would entertain significant doubt that justice would be done in the case.

*Whittey*, 149 N.H. at 465 (quotation omitted). A defendant's alleged death threat against a judge may, in extraordinary cases, warrant the judge's recusal. *See United States v. Yu-Leung*, 51 F.3d 1116, 1119-20 (2d Cir. 1995). When a judge takes an alleged death threat seriously, and the threat affects the court's procedures, recusal may be warranted. *See United States v. Greenspan*, 26 F.3d 1001, 1006-07 (10th Cir. 1994); *see also Rivera v. United States*, No. 89 CR. 346(SWK), 2001 WL 736778, at *2 (S.D.N.Y. June 29, 2001) (recusal *not* warranted where court did not take

alleged threats seriously and did not alter normal procedures in the case); *United States v. Yousef*, No. 93 CR. 180 KTD, 1999 WL 714103, at *2-*3 (S.D.N.Y. Sept. 13, 1999) (same).

█ Here, there is no evidence that the trial court considered the defendant's alleged threats realistic or credible in any way; nor is there evidence that the court in any way altered its normal procedures. Moreover, the trial judge never made any statements or gave any other indications that would suggest that he considered the threats to be serious. *Cf. Yu-Leung*, 51 F.3d at 1120. We cannot conclude that any reasonable, objective and disinterested observer, fully informed of the defendant's alleged threat, would entertain significant doubt that justice would be done in this case. Thus there was no appearance of impropriety, and the trial court properly denied the defendant's motion to recuse.

We reach the same conclusion under the Federal Constitution because it provides no greater protection than the New Hampshire Constitution or the New Hampshire Code of Judicial Conduct under these circumstances. *See Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820-22, 828 (1986) (due process standard); *Whittey*, 149 N.H. at 465.

In sum, because the trial court should have declared a mistrial without prejudice on the facts of this case, the defendant is entitled to a new trial and we decline to address his remaining arguments.

*Reversed and remanded.*

BROCK, C.J., concurred; SMUKLER and T. NADEAU, JJ., superior court justices, and GRAY, J., retired superior court justice, specially assigned under RSA 490:3, concurred.