
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MARIA LUISA JOHNSON;  )      No. 76065-3-I
CARMELIA DAVIS-RAINES;  )
CHERYL MUSKELLY; PAULINE  )      DIVISION ONE
ROBINSON; ELAINE SEAY-DAVIS;  )
TONI WILLIAMSON; and LYNDA  )
JONES,  )
      )
         Appellants,  )
      )
      v.  )
      )
SEATTLE PUBLIC UTILITIES, a  )      UNPUBLISHED
department of the city of Seattle, a  )
municipality,  )      FILED: May 14, 2018
      )
         Defendant.  )
      )

Cox, J. — Maria Luisa Johnson and others commenced this action following disciplinary action against them by Seattle Public Utilities (SPU) for violation of the City of Seattle's Ethics Code. The case went to trial, ending in a defense verdict. On appeal, Johnson and others challenge a series of discretionary decisions by the trial court. But they fail to show any abuse of discretion. Moreover, they fail in their burden to show that the trial court violated the constitutional provision barring comment on the evidence. We affirm.

Johnson, Carmelia Davis-Raines, Cheryl Muskelly, Pauline Robinson, Elaine Seay-Davis, Toni Williamson, and Lynda Jones (collectively, "Johnson") were employed by SPU as Utility Account Representatives (UARs). They worked in SPU's contact center, responding to Seattle City Light (SCL) and SPU customer requests for assistance or information regarding their bills and services. In that capacity, they had access to a database that SCL and SPU used to bill and store customer financial information. This access allowed them to waive fees, adjust account balances, and make payment arrangements for customers.

UARs are subject to the Seattle Ethics Code. Under that code, City employees may not "[p]articipate in a matter in which" the employee or an immediate family member has a financial interest.[1] They may not perform official duties when it could appear that their judgment is impaired due to personal or business relationships, without disclosure.[2] They may not use their jobs for purposes that are, or appear to be, primarily for personal benefit.[3] SPU's policy manual accordingly directed UARs to request a supervisor to provide maintenance for their own accounts or those of family or friends.

SPU discovered that certain employees had made transactions on their own utility accounts, and investigated the issue further. Guillemette Regan, SPU's Director of Risk and Quality Assurance, led the investigation. After investigating 217 SPU employees, she concluded that 77 had obtained access to

---

[1] SMC 4.16.070(A)(1).

[2] SMC 4.16.070(A)(3).

[3] SMC 4.16.070(B)(1).

their own accounts or those of friends or family. Regan submitted investigation reports to SPU's Deputy Director of Customer Service, Susan Sanchez, who made disciplinary recommendations to SPU Director Ray Hoffman. Hoffman decided to terminate 10 employees and suspend 18.

Employees raised concerns during the investigation about its possible disproportionate impact on African-American employees. Several African-American employees signed a Petition of Solidarity to express their concern.

The record shows that Maria Luisa Johnson individually made 21 financial transactions on her own account. Williamson made 66. Muskelly made 24. Davis-Raines made 3. Jones made 1. Seay-Davis made 9.

SPU terminated Maria Luisa Johnson and Williamson. SPU would have terminated Muskelly but for his retirement. Davis-Raines and Jones were suspended for one day. Seay-Davis would have been suspended but retired.

The claims initially at issue in this lawsuit were disparate impact, race and age disparate treatment, and retaliation against those who signed the Petition of Solidarity. They dismissed the disparate impact claim pretrial. The parties do not appear to dispute that four of the plaintiffs are African-American and one is Filipino. The jury returned a defense verdict at trial.

This appeal followed.

## JURY VENIRE COMPOSITION

Johnson argues that the trial court abused its discretion by declining to reconstitute the venire from which the jury was drawn. We hold that there was no abuse of discretion in this respect.

"It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court."[4] This policy, codified at RCW 2.36.080, "mandate[s] that the members of a jury panel be randomly selected."[5] And the Sixth and Fourteenth Amendments of the federal constitution similarly entitle litigants to a "petit jury selected from a fair cross section of the community."[6]

The right to a jury selected from a fair cross section of the local population does not entitle the litigant to any specific jury composition.[7] Nor is a litigant entitled to an exact cross section of the population.[8] Thus, the absence of selected jurors of any particular race does not violate this right and "is not sufficient of itself to establish racial prejudice."[9]

Because the jury panel must be randomly selected, challenges to the composition of the entire panel are limited. CrR 6.4(a) requires trial courts to only sustain such challenges made "for a material departure from the procedures prescribed by law for their selection." Without reference to CrR 6.4(a), the supreme court has held that "[w]here the selection process is in substantial

---

[4] RCW 2.36.080(1).

[5] Brady v. Fibreboard Corp., 71 Wn. App. 280, 282, 857 P.2d 1094 (1993).

[6] Duren v. Missouri, 439 U.S. 357, 359, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

[7] State v. Davis, 141 Wn.2d 798, 837, 10 P.3d 977 (2000).

[8] State v. Hilliard, 89 Wn.2d 430, 442, 573 P.2d 22 (1977).

[9] Davis, 141 Wn.2d at 837.

compliance with the statutes, the defendant must show prejudice. If there has been a material departure from the statutes, prejudice will be presumed."[10] And a selection process, even if not unconstitutionally discriminatory, "is still invalid if it systematically excludes a cognizable class of individuals."[11]

We review for abuse of discretion challenges to the venire process.[12]

Here, Johnson argues that the venire in this case does not reflect the racial composition of King County. Johnson cites to counsel's declaration below stating that only 2 percent of the 100 person venire in this case were Black or African American. Notably, there is no claim that there was a failure to randomly select the members of the venire.

After screening for hardships, the venire was reduced to 38 potential jurors that Johnson's counsel described as overwhelmingly White. Of these, eight identified as non-White. Counsel objected and proposed that the trial court pick a new, more diverse, panel. The court declined to reconstitute the venire.

The jury chosen included three jurors of color, who identified as Vietnamese, Mexican American, and East Indian. No jurors of Johnson's racial identities were chosen.

Johnson fails to present any legal authority to support the proposition that a venire is improper merely because it either fails to reflect a cross-section of the local population, or because it fails to include jurors of a party's race. As the trial

---

[10] State v. Tingdale, 117 Wn.2d 595, 600, 817 P.2d 850 (1991).

[11] State v. Clark, 167 Wn. App. 667, 674, 274 P.3d 1058 (2012).

[12] Id.

court correctly recognized, "unless there is evidence of deliberate exclusion from jury pools there is nothing that I can do."

Johnson failed below and fails on appeal to identify any deliberate exclusion or material departure from proper selection procedures. Accordingly, Johnson fails in the burden to show any abuse of discretion by the trial court in declining to reconstitute the venire in this case.

Johnson points to the lead opinion in State v. Saintcalle to support their position in this case.[13] That lead opinion is of little help here.

Only two justices signed the lead opinion. Thus, this opinion has no precedential effect on this case. The rest of the opinions reflect split views on various aspects of that case. The justices' splintered views on the question then before the court offer little help in addressing the issue in this case.

More importantly, Saintcalle is not helpful in addressing the issue here: constitution of the venire from which a jury is drawn. Rather, it concerned a Batson v. Kennedy challenge to the use of peremptory strikes against the sole African American member of a venire.[14] That is not at issue here.

Johnson argues extensively about the efforts made in society to attain greater diversity in the jury process and contends that "[i]t is at last time for such efforts to come to fruition." While this may be true, that does not mean that the

---

[13] 178 Wn.2d 34, 309 P.3d 326 (2013), abrogated by City of Seattle v. Erickson, 188 Wn.2d 721, 398 P.3d 1124 (2017)).

[14] Saintcalle, 178 Wn.2d at 35. We note that the state supreme court recently promulgated a new rule, GR 37, to address peremptory challenges implicating racial or ethnic bias. That rule does not apply to the issues in this case.

6

trial court's decision in this case was an abuse of discretion under governing standards. That is the question before us, and Johnson fails in meeting the burden of showing such abuse.

## TRIAL SCHEDULE

Johnson next argues that the trial court abused its discretion by excusing jurors who claimed financial hardship. Again, there is no showing of any abuse of discretion.

Under RCW 2.36.080(3), "[a] citizen shall not be excluded from jury service in this state on account of . . . economic status." RCW 2.36.100 further restricts a trial court from excusing otherwise qualified jurors "except upon a showing of undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court for a period of time the court deems necessary." Thus, while a juror may be excused for financial hardship, he or she may not be excluded because of his or her economic status. And a litigant has "no right to be tried by a particular jury or a particular juror."[15]

Johnson cites unhelpfully to the New Hampshire supreme court's opinion in State v. Ayer.[16] There, the court considered two statutes identical to RCW 2.36.080(3) and RCW 2.36.100, regarding exclusion for economic status and excusal for financial hardship.[17] The court explained that those excused for

---

[15] Clark, 167 Wn. App. at 673.

[16] 150 N.H. 14, 31, 834 A.2d 277 (2003).

[17] Id.

financial status did not represent a recognized group with shared status.[18] The defendant, Daniel Ayer Sr., had identified that putative group as "jurors who would suffer economic difficulty as a result of having to serve for multiple weeks at the statutory rate of compensation."[19] That group, he argued, "included people who are self-employed, work on commission, or have a relatively low income."[20]

Instead of showing those commonalities, the record revealed "that the only thing this group shares in common is that they all raised a concern regarding the economic impact to themselves or their families of serving on a jury for three weeks."[21] The court reasoned that a self-employed person or a person working on commission might earn a substantial income, "the absence of which would impose a hardship upon that individual's ability to maintain his or her standard of living."[22] The trial court had neither discerned the jurors' economic status when it excused them nor relied on that basis for the decision.[23]

Here, the trial court excused numerous jurors for financial hardship. It explained that a juror could face such hardship if she:

> work[ed] for . . . an employer that does not compensate you, that –
> and missing that money would mean that you couldn't pay your
> primary bills. Your rent. Your utilities. Your food. That's a

---

[18] Id. at 32.

[19] Id. (internal quotations omitted).

[20] Id.

[21] Id.

[22] Id.

[23] Id.

hardship. Having less money at the end of the month for, you know, discretionary spending, not a hardship.[24]

Excusal on this basis is permitted under RCW 2.36.100. It does not offend any authorities of which we are aware. Daily wage earners were not systemically excluded from the venire, but rather excused on the individualized basis of financial hardship. Johnson fails to show on this record that those excused were excused on an improper basis.

Yet Johnson argues that the trial court should have remedied the problems presented by the jury compensation scheme. This argument goes to policy and is best resolved by the legislature.[25] Again, this fails to show any abuse of discretion by the trial court, the issue properly before us.

Johnson further contends in this argument that the trial court could have adopted the alternative trial schedule that they proposed, moving that trial be held for two days a week. While the court could have decided to do so, the choice not to is far from an abuse of discretion, given other competing considerations facing the court. Johnson utterly fails to present any authority that denial of this proposed schedule was an abuse of discretion. As the trial court correctly reasoned, "that mechanism, although that is appealing, would end up excluding all sorts of other people, who can't take off two months working two days a week, childcare issues, all kinds of other things."[26]

---

[24] Report of Proceedings (August 15, 2016, K. Girgus) at 43.

[25] In re the Det. of J.N., 200 Wn. App. 279, 284, 402 P.3d 380 (2017).

[26] Report of Proceedings (August 15, 2016, D. Rawlins) at 4-5.

## EXCUSAL OF JURORS

Johnson argues that the trial court abused its discretion by dismissing three jurors for cause. The record does not support this challenge.

A litigant may challenge a juror for cause when the juror expresses actual bias.[27] RCW 4.44.170 defines actual bias as "a state of mind on the part of the juror in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." That a juror has expressed "such opinion shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially."[28] The trial court may determine whether a litigant has successfully rehabilitated a juror that expresses actual bias.[29]

We review for abuse of discretion a trial court's decision on excusing jurors for cause.[30] This standard recognizes that the trial court is in the unique position to assess potential jurors' "tone of voice, facial expressions, body

---

[27] RCW 4.44.190.

[28] Id.

[29] State v. Witherspoon, 82 Wn. App. 634, 638, 919 P.2d 99 (1996).

[30] Id.

language, or other forms of nonverbal communication."[31] We simply cannot and should not make those assessments as an appellate court.[32]

Here, Johnson argues that the trial court abused its discretion in dismissing jurors 8, 11, and 53.

Juror number 11 stated in voir dire that the fact that Johnson had commenced this action led them "to favoring for the plaintiffs to start off."[33] When Johnson's counsel attempted to rehabilitate, the juror explained that while they would strive to be impartial, they had "a bias from my past history of knowing individuals who work for the City of Seattle and some other Seattle City Light in the past. There is built up animosity, if you will, that is there."[34]

Juror number 8 stated that the defense would have "a really tough road to break down all of these stories of these people that I feel so strongly in their experiences."[35] The juror later repeated these concerns following Johnson's counsel's attempt at rehabilitation, stating "that the plaintiffs' side would want me on this jury, that the defense would have a very tough time. They have a tough

---

[31] State v. Lawler, 194 Wn. App. 275, 287, 374 P.3d 278, review denied, 186 Wn.2d 1020 (2016).

[32] Id.

[33] Report of Proceedings (August 16, 2016, D. Rawlins) at 107.

[34] Id. at 125.

[35] Id. at 107.

road."[36] They explained that it would be "really hard to put aside" personal experiences and those of close friends with racial injustice.[37]

Defense counsel further asked this juror whether "if you were in my position and trying to pick a jury that was fair and unbalanced [sic], would you have any concerns about you sitting on this jury?"[38] Juror number 8 answered affirmatively.[39]

Juror number 53 initially stated that SPU was "going to have to prove" that plaintiffs' claims were insufficient.[40] After the trial court explained that the burden of proof properly lay on the plaintiffs, Juror number 53 explained that while they "agree[d] with everything that the judge said," they nonetheless maintained a "predisposition on my part that I am going to be empathetic with what I see as the victim in this case. It is just a knee-jerk reaction."[41] They understood the instruction on burden of proof to mean "that both sides equally need to prove their case."[42] This juror answered equivocally when asked whether they could put aside their bias and explained that "it would be a twist ending" if they found

---

[36] Id. at 124.

[37] Id.

[38] Id. at 123.

[39] Id.

[40] Id. at 109.

[41] Id. at 112.

[42] Id. at 128.

for the defense.[43] They explained that they "would be surprised with if [sic] my mind was changed."[44]

The trial court did not abuse its discretion by dismissing these three jurors for cause. All three expressed actual bias towards supporting Johnson's position. The trial court asked defense counsel to justify the challenges made and allowed Johnson's counsel to attempt to rehabilitate. Based on the answers provided, and the circumstances and nonverbal communication that this court cannot assess, the trial court granted defense counsel's challenges. It determined that the attempted rehabilitation had been unsuccessful. We have no reason to second guess the trial judge in making these determinations, all of which seem amply supported by this record.

Johnson contends that the trial court dismissed these jurors on an improper "if you were in my spot" basis. This argument has no merit.

Defense counsel asked these three dismissed jurors whether they would choose such jurors if they were arguing for the defense. Such a question did not establish a novel basis for dismissal of jurors. It merely sought to discern whether the jurors held an actual bias against the defense.

### DR. ANTHONY GREENWALD'S TESTIMONY

Johnson argues that the trial court abused its discretion by excluding Dr. Greenwald's testimony on implicit bias. There was no abuse of discretion in rejecting this proposed expert testimony.

---

[43] Id. at 127.

[44] Id.

ER 702 requires a trial court to determine whether an expert's otherwise qualified testimony would be helpful to the trier of fact. Washington courts have provided extensive guidance on what renders expert testimony helpful. An expert's testimony is helpful if it assists the jury in "understanding matters outside the competence of ordinary lay persons."[45] And the court gauges the extent of that helpfulness on what the parties bear the burden of proving or disproving in a particular claim.[46] Further, the expert must also "ground his or her opinions on facts in the record."[47] When testimony may be "somewhat speculative . . . the court should keep in mind the danger that the jury may be overly impressed with a witness possessing the aura of an expert."[48]

The trial court has wide discretion in deciding whether expert testimony is helpful.[49] "This court will not disturb the trial court's ruling '[i]f the reasons for admitting or excluding the opinion evidence are both fairly debatable.'"[50]

---

[45] Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 600, 260 P.3d 857 (2011).

[46] See Colley v. Peacehealth, 177 Wn. App. 717, 728-29, 312 P.3d 989 (2013).

[47] Volk v. DeMeerleer, 187 Wn.2d 241, 277, 386 P.3d 254 (2016).

[48] Davidson v. Mun. of Metro. Seattle, 43 Wn. App. 569, 571-72, 719 P.2d 569 (1986).

[49] Stedman v. Cooper, 172 Wn. App. 9, 18, 292 P.3d 764 (2012).

[50] Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (quoting Miller v. Likins, 109 Wn. App. 140, 147, 34 P.3d 835 (2001)).

Additionally, the trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the danger of" confusing or misleading the jury.[51]

Here, Dr. Greenwald is a well-respected and widely published scholar of social psychology, cognitive psychology, and research methodology. He is a tenured faculty member in the University of Washington's psychology department. Johnson retained him to "provide expert witness testimony concerning psychological understanding of *implicit bias*."[52]

Implicit bias is "a class of mental processes that function outside of conscious awareness."[53] This concept has superseded earlier academic understandings that people are guided solely by their explicit and conscious intentions.

To study this phenomenon, Dr. Greenwald developed a research method called the Implicit Association Test (IAT). Subjects have taken the IAT in various forms more than 17 million times. Its methodology and its results have received positive peer review in the relevant field.

Dr. Greenwald believed that his testimony would help the jury to "better understand the evidence as it relates to discriminatory intent, to counteract common misconceptions concerning the character of discriminatory intent, and to

---

[51] ER 403.

[52] Clerk's Papers at 318.

[53] Id. at 320.

determine whether Plaintiffs' racial status provided a basis for Defendants' actions."[54]

He intended to testify that implicit bias is pervasive and is "often observed in more than 70% of Americans, most of whom genuinely and sincerely regard themselves as lacking in biases," "is scientifically established as a source of discriminatory judgment and decision making in personnel decisions," can influence "[d]iscretion-affording personnel evaluations that permit subjectivity in decision making," "operate[s] outside of (conscious) awareness," and "contribut[es] to discriminatory outcomes" that favor the in group.[55]

Dr. Greenwald expressed the belief that "these general principles and the opinions related to them . . . apply to the evaluation of the facts of this case."[56] Notably, he failed to identify anything in the record beyond the complaint that informed his knowledge of the facts of this case.

The parties do not appear to dispute either that Dr. Greenwald is qualified to offer this testimony or that it is based on reliable methods. The heart of the dispute is whether the testimony pertained to the facts of this case.

They identify three federal district court cases that examined the admission or exclusion of Dr. Greenwald's testimony under the federal rules of evidence in the context of employment discrimination actions. As this court has stated, "[t]he broad standard of abuse of discretion means that courts can

---

[54] Id. at 322.

[55] Id. at 323-26.

[56] Id. at 335.

reasonably reach different conclusions about whether, and to what extent, an expert's testimony will be helpful to the jury in a particular case."[57]

The first of these cases, Samaha v. Washington State Department of Transportation, was decided by the United States District Court for the Eastern District of Washington.[58] In that case, Elias Samaha brought several claims under federal civil rights statutes and under the Washington Law Against Discrimination.[59] He alleged that he suffered disparate treatment, particularly in his performance evaluations, because of his Arab descent.[60]

Pretrial, the Department of Transportation moved to exclude Dr. Greenwald's testimony, arguing that Dr. Greenwald had neither applied his theories of implicit bias to the facts nor opined whether implicit bias informed the employment decisions at issue.[61]

The court disagreed, explaining that "[t]estimony that educates a jury on the concepts of implicit bias and stereotypes is relevant to the issue of whether an employer intentionally discriminated against an employee."[62] The court held that the testimony should not be excluded based on an Advisory Committee Note to FRE 702. This note advises that expert testimony as to "general principles,

---

[57] Stedman, 172 Wn. App. at 18.

[58] 2012 WL 11091843 (E.D. Wash. Jan. 3, 2012).

[59] Id. at *1.

[60] Id.

[61] Id. at *2.

[62] Id. at *4.

without ever attempting to apply these principles to the specific facts of the case" may nonetheless help the factfinder.[63] This appears to be a discretionary reading of the federal rule, nothing more.

Two years later, the United States District Court for the Northern District of Illinois considered Dr. Greenwald's testimony in an employment discrimination case, Jones v. National Council of Young Men's Christian Associations.[64] It rejected that testimony, reasoning that it could not reliably support an opinion that the employer in that case, the National Council of the YMCA, was liable for employment discrimination.[65]

Considering the principle employed by the Samaha court, the Jones court explained that "[e]ven opinions about general principles have to be logically related to the factual context of a case to be admissible – those general principles must still 'fit' the case."[66] It noted the "substantial disconnect between the abstract testing from which Dr. Greenwald's 'general principle' is derived and the fact context of this case."[67] It explained that Dr. Greenwald's methodology tested the implicit bias of subjects against "virtual strangers in laboratory settings

---

[63] Id. (quoting Fed. R. Evid. 702 advisory committee's note to the 2000 amendment).

[64] 34 F. Supp. 3d 896 (N.D. III. 2014).

[65] Id. at 901.

[66] Id. at 900.

[67] Id. at 901.

whom they will never meet or see again, with nothing at stake."[68] The employers in this case, by contrast "kn[e]w the people for whom they are making important decisions concerning their pay, promotions, and performance evaluations."[69] Under such circumstances, the testimony threatened to "blur, if not erase altogether, the line between hypothetical possibility and concrete fact."[70] As a result, even if the general principles "fit" the facts of the case, FRE 403 would support exclusion due to the risk of confusion to the jury.[71]

More recently, the United States District Court for the Western District of Pennsylvania considered Dr. Greenwald's testimony in Karlo v. Pittsburgh Glass Works, LLC.[72] Again, the employer sought to exclude Dr. Greenwald's testimony as unrelated to the facts of the case.[73] The court examined both Jones and Samaha.[74] It excluded the testimony, finding that Dr. Greenwald had not examined the facts of the case.[75] He had not spoken to anyone associated with the employer, visited its facilities, or "perform[ed] any independent, objective analysis on whether implicit biases played any role in the decisions to terminate

---

[68] Id. at 900.

[69] Id.

[70] Id. at 901.

[71] Id.

[72] 2015 WL 4232600 (W.D. Pa. Jul. 13, 2015) vacated by 849 F.3d 61 (3rd Cir. 2017).

[73] Id. at *1.

[74] Id. at *6-7.

[75] Id. at *7.

19

the remaining Plaintiffs."[76] Because of this, and because the court held that implicit bias may not be relevant to a cause of action requiring a showing of *intentional* discrimination, the court excluded Dr. Greenwald's testimony.[77]

Dr. Greenwald's testimony in this case was analogous to that in Samaha, Jones, and Karlo. SPU raises similar concerns to those raised by the employers in those cases, albeit in the context of Washington's ER 702 and ER 403 rather than the federal counterparts. Federal courts are split on whether Dr. Greenwald's theories of implicit bias are relevant to claims such as those in this case that require a showing on discriminatory intent. And the superior court in this action was not bound to follow those federal courts. Rather, the court was free to apply ER 702 and ER 403, as it did. In doing so, we note that Johnson admitted in their motions in limine that "Dr. Greenwald will not state an opinion on the specifics of this case."[78]

The trial court properly recognized the important policy concerns presented by the concept of implicit bias. But it also properly concluded that Dr. Greenwald's testimony consisted only of "generalized opinions that are not tied to the specific facts of this case."[79] On this basis, it held that admission of the

---

[76] Id.

[77] Id. at *9 (emphasis added).

[78] Clerk's Papers at 127.

[79] Report of Proceedings (August 5, 2016) at 5-6.

testimony "would be confusing and misleading for the jury."[80] This was a perfectly permissible basis on which to exclude the testimony.

## KATHLEEN JEZIERSKI'S TESTIMONY

Johnson argues that the trial court abused its discretion by permitting Jezierski to testify despite SPU's disclosure violation. We disagree.

CR 26(b)(5) entitles a party to "'[d]iscovery of facts known and opinions held by experts" to the extent otherwise discoverable. King County LCR 26(k) implements this rule by requiring parties to "no later than the date for disclosure designated in the Case Schedule, disclose all" expert witnesses whom the party might call. Disclosure of expert witnesses must include "[a] summary of the expert's opinions and the basis therefore and a brief description of the expert's qualifications."[81] Parties must also, as appropriate, supplement their responses with the identity of experts expected to testify, "the subject matter on which the expert witness is expected to testify, and the substance of the expert witness's testimony."[82]

The trial court has discretion to impose sanctions for failure to comply with this rule.[83] Exclusion of the expert's testimony is one possible sanction if the

---

[80] Id. at 6.

[81] LCR 26(k)(3)(C).

[82] CR 26(e)(1)(B).

[83] Johnson v. Mermis, 91 Wn. App. 127, 133, 955 P.2d 826 (1998).

proponent of the testimony engaged in willful intentional nondisclosure, willful violation of a court order, or other unconscionable conduct.[84]

This court reviews for abuse of discretion a ruling on the imposition of sanctions.[85]

Here, the case schedule mandated disclosure of possible primary witnesses by February 2, 2016, and possible additional witnesses by March 21, 2016. Discovery cut off was set at May 23, 2016. On the cutoff date, SPU filed and served a disclosure of witnesses listing as an expert, "[a]n individual from COPC, Inc. [who] will provide expert testimony regarding call center standards and expectations."[86]

At trial on September 6, 2016, Johnson objected to Jezierski's testimony unless first being permitted to depose her the night before SPU expected to call her. They alleged that SPU had violated CR 26 and LCR 26.

SPU responded by referencing its May 23 disclosure. It explained that it intended to call Jezierski only as a rebuttal witness whom Johnson could have deposed in the months since the disclosure.

The trial court ruled that Johnson had three months since the disclosure, during which time Jezierski could have been deposed. It held that the disclosure had been sufficient.

---

[84] Mayer v. Sto Industries, Inc., 156 Wn.2d 677, 687-88, 132 P.3d 115 (2006).

[85] Mermis, 91 Wn. App. at 133.

[86] Clerk's Papers at 5824.

The trial court did not abuse its discretion in permitting Jezierski to testify without a last minute deposition. Johnson has not provided authority establishing any such abuse.

Johnson cites in rebuttal to <u>Magana v. Hyundai Motor America</u>.[87] But that case does not help.

There, Jesse Magana brought a products liability action against Hyundai after suffering severe personal injury allegedly caused by a seat back failure.[88] Pretrial, Magana requested production of documents indicating any such failures since 1980.[89] Hyundai provided incomplete responses, characterizing the specific requests as overly broad.[90] But Magana still prevailed at trial.[91] Hyundai appealed.[92] For reasons not relevant here, the case was remanded for retrial.[93]

Before retrial commenced, Magana made further requests for production.[94] Hyundai responded that several of these requests were over

---

[87] 167 Wn.2d 570, 220 P.3d 191 (2009).

[88] <u>Id.</u> at 577-78.

[89] <u>Id.</u> at 577.

[90] <u>Id.</u>

[91] <u>Id.</u> at 578.

[92] <u>Id.</u>

[93] <u>Id.</u>

[94] <u>Id.</u> at 579.

burdensome.[95] It did not provide complete responsive discovery.[96]

Based on the insufficiency of discovery, Magana moved for a default judgment.[97] The trial court granted that motion, finding that Hyundai willfully violated CR 26, substantially prejudicing Magana, and that a lesser sanction would not do.[98] This court reversed the imposition of the default judgment but the supreme court reinstated it, holding that "[t]he Court of Appeals substituted its own discretion for the trial court's."[99] It was not the province of an appellate court to reverse the trial court's discretionary imposition of sanctions for a CR 26 violation so long as based on sufficient findings.[100]

This case stands for the proposition that the trial court has discretion to impose sanctions for violations of CR 26, so long as it complies with certain procedures not relevant here. In no way does Magana mandate the imposition of sanctions for any violations in this case.

One exception to this general rule applies to certain violations of CR 26(g). Sanctions for such violations are mandatory.[101] Johnson cites for this proposition

---

[95] Id.

[96] Id.

[97] Id. at 580.

[98] Id. at 582.

[99] Id. at 590.

[100] Id.

[101] Wash. State Physicians Ins. Exchange & Ass'n v. Fisons Corp., 122 Wn.2d 299, 355, 858 P.2d 1054 (1993).

to <u>Washington State Physicians Ins. Exchange & Association v. Fisons Corporation</u>.[102] But Johnson cites no comparable authority for the proposition that violations of CR 26(b), CR 26(e), or LCR 26(k) trigger mandatory penalties.[103] Nor is there any reasoned argument why the precedent set forth in <u>Fisons</u> should be extended beyond the rule relevant in that case. The claimed violation of CR 26(g) in the reply brief is too late to warrant this court's consideration.[104]

Johnson contends that they requested production of the resumes and reports of experts expected to testify. And they further contend that SPU declined to provide these documents. But they cite for this purpose to SPU's fourth response to requests for production dated September 30, 2015. Such a document, served several months before the cutoff dates noted above, is not relevant to compliance with those dates. Although SPU appears not to have supplemented this response, it identified Jezierski in the witness disclosure list.

Johnson summarily argues that Jezierski's testimony was inadmissible under ER 402, 403, 701, and the <u>Frye v. United States</u> test.[105] They allege that Jezierski relied on "junk science," that she had never testified as an expert

---

[102] 122 Wn.2d 299, 355, 858 P.2d 1054 (1993).

[103] <u>See Darkenwald v. Emp't Sec. Dep't</u>, 183 Wn.2d 237, 248, 350 P.3d 647 (2015); RAP 10.3(a)(6).

[104] RAP 10.3(c); <u>Basin Paving Co. v. Contractors Bonding and Ins. Co.</u>, 123 Wn. App. 410, 415, 98 P.3d 109 (2004).

[105] Brief of Appellants at 49-50 (citing <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923)).

before, and that she drew her opinions from a company database. This court does not address arguments so cursorily presented.[106]

## COMMENT ON EVIDENCE

Johnson argues that the trial court unconstitutionally commented on a matter of fact. Because this argument was not preserved below and does not qualify for any exception for review, we disagree.

Under RAP 2.5(a)(3), a party may raise, for the first time on appeal, a manifest error affecting a constitutional right.[107] The party "must identify the constitutional error and show that it actually affected his or her rights at trial" in order to claim a manifest error affecting a constitutional right.[108] This requires that the party "make a plausible showing that the error resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial."[109]

Article IV, section 16 of the Washington constitution provides that "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." "A statement by the court constitutes a comment on the evidence if the court's attitude toward the merits of the case or the court's evaluation relative to the disputed issue is inferable from the statement."[110]

---

[106] Bercier v. Kiga, 127 Wn. App. 809, 824, 103 P.3d 232 (2004).

[107] See State v. Lamar, 180 Wn.2d 576, 582, 327 P.3d 46 (2014).

[108] Id. at 583.

[109] Id.

[110] State v. Lane, 125 Wn.2d 825, 838, 889 P.2d 929 (1995).

Here, Johnson relies on this state constitutional provision to argue that the trial court committed reversible error. But the question is whether the record shows that any such error was "manifest." We conclude that it does not.

Unnamed individuals outside the courthouse distributed a pamphlet entitled "A Jury of Peers" that discussed jury nullification in relation to racial disproportionalities in the criminal justice system and incarceration. At least two potential jurors on the venire in this case received this pamphlet.

The trial court addressed this matter with counsel before summoning the venire. It described the pamphlet to counsel as neither attorney had seen it. While distinguishing this case from the criminal matters discussed in the pamphlet, the trial court suggested that potential jurors "may want to discuss these issues" with counsel during voir dire.

The trial court made similar remarks shortly after to the venire. It acknowledged to potential jurors that similar issues of racial disproportionality were "very much in the forefront in the media." Because the case involved employment discrimination, the trial court recognized that such issues may or may not appear relevant to the potential jurors. It explained that while such issues might not appear relevant to some potential jurors, they should "feel free to discuss it with the attorneys."

Johnson fails on this record to demonstrate that these remarks violated the constitutional prohibition in any way. The remarks did not show the court's view of the evidence nor otherwise offended the state constitution. The claimed error is not manifest. Accordingly, we do not further address this claim.

27

## ER 1006

Johnson argues that the trial court abused its discretion by admitting exhibits 497, 498, 499, 501, and 502. We again disagree.

ER 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

The documents underlying such summaries must themselves be admissible.[111] But the inaccuracy of a summary under ER 1006 goes to weight, not admissibility.[112] An ER 1006 summary remains admissible even though a small portion is not supported by documentation when opposing counsel had the opportunity to cross-examine the authenticating witness.[113]

This court reviews for abuse of discretion the admission of a summary chart under ER 1006.[114] And it will only reverse due to evidentiary error if "it is reasonable to conclude that the trial outcome would have been materially affected had the error not occurred."[115]

---

[111] State v. Marshall, 25 Wn. App. 240, 243, 606 P.2d 278 (1980).

[112] See BD ex rel. Jean Doe v. DeBuono, 193 F.R.D. 117, 130 (S.D.N.Y. 2000).

[113] 224 Westlake, LLC v. Engstrom Properties, LLC, 169 Wn. App. 700, 732, 281 P.3d 693 (2012).

[114] State v. Barnes, 85 Wn. App. 638, 658, 932 P.2d 669 (1997).

[115] Lutz Tile, Inc. v. Krech, 136 Wn. App. 899, 905, 151 P.3d 219 (2007).

At the threshold, Johnson fails to provide reasoned argument regarding the inadmissibility of exhibits 499 and 502. They further clarify in their reply brief that the reference to exhibit 499 was accidental. We deem the challenges to these two exhibits abandoned.[116]

Regarding exhibit 497, Johnson argues that the information for Tanisha Wagner is inaccurate. The exhibit indicates that she was suspended for 30 days in lieu of termination. Johnson argues that this is inaccurate because it fails to indicate that Wagner received the alternative discipline of suspension in exchange for entering a last chance agreement. But this does not render inaccurate the facts presented in the summary. To the extent it qualifies or complicates the facts presented, this goes to the summary's weight, not admissibility.

Regarding exhibit 498, Johnson brings two challenges. First, they argue that this short exhibit was not based on voluminous records. Second, they argue that the activity summary for Michael Mannery is inaccurate. That summary includes the line "Adj., svc orders, and notes on dad's acct." Johnson contends that this omits facts in the supporting documentation regarding seven service orders Mannery made on his father's account, and that Manner made a transaction that violated SPU Policy CS-106. These challenges lack merit.

Johnson fails to cite authority indicating some threshold of voluminousness the trial court must find to not abuse its discretion. The exhibit

---

[116] See Holder v. City of Vancouver, 136 Wn. App. 104, 107, 147 P.3d 641 (2006).

*does* indicate service orders on Mannery's account. And Johnson fails to show how omission of an additional policy violation demonstrates an inaccuracy or prejudiced the result at trial.

Regarding exhibit 501, Johnson argues that admissible evidence did not support the summary of activity on Arece Hampton's account. That summary read "1. No trans on own acct; 2. Rreviewed [sic] trans related to shut off." The trial court reviewed Johnson's identical challenge below to the claim that no transactions were found on Hampton's own account and reasoned that it would require SPU to "prov[e] a negative." Because this would not be possible, the trial court ruled that the exhibit was admissible. As to the language about reviewing transactions related to shut off, Johnson fails to explain how such a minor omission of documentation would render the exhibit inadmissible or cause him prejudice. Nor do they explain their failure to challenge the authenticating witnesses on cross-examination.

## JURY INSTRUCTIONS

Johnson argues that the trial court abused its discretion by not giving proposed instructions numbers 3, 4, and 13. We hold that the rejection of these proposed instructions was proper.

"Jury instructions are sufficient when they allow parties to argue their theory of the case, are not misleading, and, when taken as a whole, inform the

jury of the applicable law."[117] A trial court need not give a party's proposed instruction, even if accurate, if the instructions are otherwise sufficient.[118]

The party challenging the refusal to provide an instruction must also show prejudice.[119] The failure to give a proposed instruction is not prejudicial where the verdict would not have changed.[120]

This court reviews for abuse of discretion a trial court's ruling on jury instructions.[121]

*Implicit Bias Instructions*

Johnson argues that the trial court abused its discretion by not giving proposed instructions numbers 3 and 4 concerning implicit bias.

Proposed instruction no. 3 is over a page long. In summary, it explains to the jury that people hold automatic and biased assumptions. It references the work of social scientists in the field of implicit bias. On this basis, it urges jurors to reflect on their possible implicit bias, taking the time and exercising the focus to reach an objective result. It encourages jurors to imagine the parties "looked different" or "belonged to a different group." It asks jurors to consult with other jurors "who may have different backgrounds."

---

[117] Farah v. Hertz Transp., Inc., 196 Wn. App. 171, 177, 383 P.3d 552 (2016).

[118] Id.

[119] Terrell v. Hamilton, 190 Wn. App. 489, 499, 358 P.3d 453 (2015).

[120] Id.

[121] Farah, 196 Wn. App. at 177.

Proposed instruction no. 4 reads:

> As we discussed in jury selection, growing scientific research indicates each one of us has 'implicit biases,' or hidden feelings, perceptions, fears[,] and stereotypes in our subconscious. These hidden thoughts often impact how we remember what we see and hear, and how we make important decisions. While it is difficult to control one's subconscious thoughts, being aware of these hidden biases can help counteract them. As a result, I ask you to recognize that all of us may be affected by implicit biases in the decisions that we make. Because you are making very important decisions in this case, I strongly encourage you to critically evaluate the evidence and resist any urge to reach a verdict influenced by stereotypes, generalizations, or implicit biases.[122]

Several reasons support the trial court's refusal to give these instructions. First, while the proposed instructions provide further neuroscientific elaboration, they are similar in substance to language in instruction number 1, requiring jurors to "reach your decision based on the facts proved to you and on the law given to you, not on sympathy, bias, or personal preference."[123] Johnson does not explain why this instruction was insufficient.

Second, these proposed instructions explicitly referenced neuroscientific and social scientific evidence that was not adduced at trial. In their brief, Johnson connects the content of these instructions to Dr. Greenwald's testimony. Because the trial court excluded that testimony, it would mislead the jury to give instructions that replicated it.

---

[122] Clerk's Papers at 711.

[123] Id. at 5588.

Additionally, Johnson fails to show that they were prejudiced by the trial court's refusal to give these instructions, especially in light of instruction number 1.

### Pretext Instruction

Johnson argues that the trial court abused its discretion by not giving proposed instruction no. 13 concerning pretext.

The challenged instruction reads:

> You may find that a plaintiff's age and/or race was a substantial factor in the defendant's decision to suspend, terminate, place on administrative leave, or threaten that plaintiff with suspension or termination if it has been proved that the defendants' stated reasons for either of the decisions are not the real reasons, but are a pretext to hide age and/or race discrimination.[124]

This court previously examined this instruction in Farah v. Hertz Transporting, Inc.[125] In that case, Muslim airport "shuttlers" were terminated for not punching out before prayer.[126] They commenced an action for employment discrimination and were represented by John Sheridan, Johnson's counsel here.[127] Sheridan proposed a pretext instruction substantively identical to proposed instruction number 13.[128]

---

[124] Clerk's Papers at 720.

[125] 196 Wn. App. 171, 383 P.3d 552 (2016).

[126] Id. at 174.

[127] Id. at 173.

[128] Id. at 177.

This court held that this instruction accurately stated the law.[129] But it ultimately followed several federal appeals circuits that had held it was not required.[130] It determined that the arguments in its favor were not compelling enough to hold that it is an abuse of discretion to refuse to give the instruction.[131] The court's general instructions were sufficient for Farah to inform the jury of the applicable law and allow Farah to argue his theory of the case.[132]

Here, Johnson contends that this instruction was necessary "[g]iven the lack of diversity of the panel, the exclusion of implied bias evidence and jury instructions, and the errors that followed." The pretext instruction, Johnson contends, "would have helped the jury connect the dots to a discriminatory motive."

But this is not the standard. Johnson must demonstrate that the jury instructions presented were insufficient to allow them to argue their case, or were misleading or incomplete. They have not done so. Thus, as in Farah, it was not necessary that the trial court give proposed instruction number 13, and the failure to do so was not an abuse of discretion. Johnson does not show how the refusal to give this instruction prejudiced the result.

---

[129] Id.

[130] Id. at 179-80.

[131] Id. at 180.

[132] Id.

Johnson goes on to argue that this court should overrule Farah. This court does not "overrule" the decisions of other panels. In any event, we do not disagree with the decision in that case.

Johnson also argues generally that the Washington Law Against Discrimination is more protective than federal employment discrimination law. While true, this adds nothing of substance to the arguments before us.

## NEW TRIAL

Johnson argues that the trial court abused its discretion by denying their motion for a new trial. We disagree.

This court reviews for abuse of discretion a trial court's denial of a new trial motion.[133] "The test for determining such an abuse of discretion is whether 'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent [the] litigant from having a fair trial.'"[134]

Here, none of the alleged errors would have so prejudiced the jury as to deny Johnson a fair trial.

## ATTORNEY FEES

Johnson argues that this court should award them attorney fees if they prevail under the Washington Law Against Discrimination, codified at RCW

---

[133] Hickok-Knight v. Wal-Mart Stores, Inc., 170 Wn. App. 279, 324-25, 284 P.3d 749 (2012).

[134] Collins v. Clark County Fire Dist. No. 5, 155 Wn. App. 48, 81, 231 P.3d 1211 (2010) (quoting Aluminum Co. of Am. v. Aetna Cas. & Sur. Co., 140 Wn.2d 517, 537, 998 P.2d 856 (2000)).

35

49.60.030(2). Because they do not prevail, we deny the request for fees on appeal.

We affirm the judgment on the jury verdict and deny the request for attorney fees on appeal.

_____ Cox, J.

WE CONCUR:

_____          _____ Spearman, J.